HOME SAVINGS OF AMERICA,
F.S.B., and H.F. Ahmanson
& Co., Plaintiffs,

v.

The UNITED STATES of
America, Defendant.

No. 92–620C.

United States Court of Federal Claims.

Sept. 3, 2003.

Michael A. Carvin, Steven S. Rosenthal, Jeffery A. Tomasevich, and Douglas A. Tucker, each of Washington, D.C., for plaintiffs.

Lee M. Straus, John N. Kane, Jerome A. Madden, Jordan A. Thomas, Ann Loughlin, Commercial Litigation Branch, United States Department of Justice, argued for defendant. With them on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director.

---

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. Both Home Savings and Ahmanson were acquired by Washington Mutual in September of 1999.

## OPINION

BRUGGINK, Judge.

This case is part of the *Winstar*[1] litigation arising out of the savings and loan crisis of the late 1980s. This is the third in a series of opinions in this case. *Home Sav. of America, F.S.B. v. United States,* 51 Fed.Cl. 487 (2002) (*"Home Savings II "*); *Home Sav. of America, F.S.B. v. United States,* 50 Fed.Cl. 427 (2001) (*"Home Savings I "*). The issue remaining is whether plaintiffs have proven damages from the breach of contract by the government found in *Home Savings I,* 50 Fed.Cl. at 442. Trial was held from February 3, 2003 to February 25, 2003 in Washington, D.C. For the reasons set out below, we find that plaintiffs have proven damages in the amount of $134,045,000.

## BACKGROUND

Home Savings of America, F.S.B. ("Home Savings") is a wholly owned subsidiary of H.F. Ahmanson and Co. ("Ahmanson").[2] In the 1980s, Home Savings was the largest thrift in the country. Based in California, it was conservatively run and weathered the savings and loan crisis significantly better than other thrifts. The majority of its assets were in single-family residential loans, funded by savings accounts. During the savings and loan crisis, federal regulators were seeking healthy thrifts,[3] such as Home Savings, to take-over failing thrifts. Eventually, Home Savings took part in five transactions to acquire seventeen thrift institutions. These transactions are referred to herein as the: (1) Florida/Missouri transaction, (2) Texas/Illinois transaction, (3) Century transaction, (4) Ohio transaction, and (5) Bowery transaction.[4] Each supervisory merger required the execution of assistance agreements with federal regulatory agencies.

In *Home Savings I,* we determined that the government promised plaintiffs that supervisory goodwill[5] acquired in connection

3. The terms "savings and loan" and "thrift" are used interchangeably in this opinion.

4. Plaintiffs withdrew their claim with respect to the Bowery transaction. *Home Savings I,* 50 Fed.Cl. at 427.

5. The excess of liabilities over assets.

with the above transactions could be counted towards regulatory capital requirements. *Home Savings I*, 50 Fed.Cl. at 442. We held further that the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 ("FIRREA"), constituted a breach of the government's contract with plaintiffs. We also held, however, that the Federal Savings and Loan Insurance Corporation ("FLSIC") and the Federal Home Loan Bank Board ("FHLBB") lacked the authority to make promises to plaintiffs regarding supervisory goodwill with respect to those Ohio thrifts which were not federally insured. *Id.*

In *Home Savings II*, we dismissed plaintiffs' takings claim, finding that no property interest had been taken for public use. *Home Savings II*, 51 Fed.Cl. at 495. Additionally, we held that H.F. Ahmanson, as a participant in the acquisition, is a proper party plaintiff in this action. Ahmanson entered into an implied-in-fact contract with FHLBB for the acquisition by Home Savings of the thrifts in each transaction. The government promised Ahmanson that Home Savings could utilize supervisory goodwill as regulatory capital. *Id.* at 499. What remained for trial was a determination of whether, and to what degree, plaintiffs were harmed by the disallowance of supervisory goodwill by FIRREA.

### FACTS

A. Home Savings' Business Practices

The modern savings and loan industry has been highly regulated since the Great Depression, when FHLBB and FSLIC were created. *See Winstar*, 518 U.S. at 844, 116 S.Ct. 2432. From that time forward, thrifts have been subject to regulations regarding their capitalization. From 1980 until 1985 thrifts were required to maintain minimum regulatory capital of 3% of liabilities, 47 Fed. Reg. 3543 (Jan. 14, 1982).[6] That is, the thrift

had to support at least 3% of its liabilities with regulatory capital. Beginning on March 21, 1985, the capital requirement was changed to a variable rate from 3 to 5%, based on a percentage of newly acquired liabilities. 50 Fed.Reg. 6891 (Feb. 19, 1985).[7]

Home Savings was consistently able to meet regulatory requirements throughout the savings and loan crisis. Home Savings was very efficient at raising deposits.[8] It was able to market itself as a safe, sound thrift which targeted the stable, over–40 demographic. It built up one of the best branch systems in the country. Home Savings took great care that its branches were well located and aesthetically pleasing in order to foster its conservative, stable image. The cash gained through deposits primarily was used to fund home mortgage loans. Although low-yielding, these loans were also virtually risk-free. Home Savings consistently earned a profit on the spread between the relatively low rate demanded by depositors and the rate it charged borrowers.

Plaintiffs offered two principal witnesses to explain the operating practices of Home Savings. Mr. Richard H. Deihl was Chairman of Home Savings and President and CEO of Ahmanson beginning in 1984. He was Chairman from 1986 until 1990, when he again became President. He stepped down from his position as CEO in 1993, and from his position as President of Ahmanson in 1994. Mr. Charles Rinehart became the CEO of both entities beginning in 1993. He became Chairman in 1994, until Home Savings was sold in 1998. Both Mr. Rinehart and Mr. Deihl exhibited extensive knowledge about the inter-workings of Home Savings and Ahmanson, as well as the mechanics of supervised mergers. Both were impressive, credible witnesses.

Mr. Deihl explained that, while required to maintain capital for regulatory purposes, Home Savings did not otherwise need capital for its operations. Meeting capital require-

---

**6.** The requirement was effective retroactive to December 31, 1980.

**7.** These requirements were again changed, after the execution of all assistance agreements at issue in this case, on January 1, 1987. *See* 51 Fed.Reg. 33,565 (Sept. 22, 1986).

**8.** Mr. Deihl recounted one instance in Illinois, in which Home Savings was able to raise $100 million of new deposits in one month.

ments was, in effect, the price Home Savings paid to open its doors. Regulatory capital could be generated through retained earnings, through issuances of preferred stock, or subordinated debt. Home Savings, however, would not have raised capital simply to generate cash. The cheapest source for cash was through new deposits.[9] From Mr. Deihl's perspective, the required capital minimums thus had no operational purpose for Home Savings; the minimums served only to protect against risky behavior by thrifts generally.

> [I]f you ran a very conservative savings and loan, with low-yield loans, but risk free or very close to risk-free and you did it with low cost savings, it's my belief you could do it with no capital and run a very healthy savings and loan. You could also have 10 percent capital and be very risky.

Trial Transcript (Trial Tr.) at 585.

The cash generated by Home Savings, regardless of its source, was used for all purposes, including general operations and loans. In an operational sense, Home Savings drew no distinction between cash brought in through deposits, earnings, or market-based capital raisings. It could be used for any purpose. Home Savings made no effort to track how cash, once raised, was used within Home Savings. In fact, Mr. Deihl could not envision a means by which such tracking could be accomplished.

Home Savings routinely maintained an amount of capital in excess of the regulatory minimum. This capital cushion was intended to provide Home Savings with sufficient capital to meet forecasted as well as unanticipated needs. Mr. Deihl explained that Home Savings was "always trying to figure out how small that cushion could be and still be well-capitalized, able to withstand any shocks of the government raising the minimum requirements, being considered by regulators as acquiring candidates[,][b]eing able to grow." Trial Tr. at 590. Home Savings also maintained a capital cushion for the additional reason that "there's a possibility of losing money, terrible thing to contemplate

... but that uses up capital. So you have to always concern yourself with a slump in economic conditions and so forth. That was a use of capital." Trial Tr. at 591.

The management of Home Savings set target capital levels based on projected changes in regulations, the possibility of growth through acquisitions, and economic conditions at the time. Mr. Rinehart explained that Home Savings' capital level was a "moving target" always changing, based on "how quickly [the thrift was] going to have to achieve various [capital] levels." Mr. Deihl outlined the process by which Home Savings determined, on a short term basis, what core capital ratio to maintain, stating:

> We set a number every two weeks or month or two or five months. It was constantly changing. What we were trying to do was estimate what was the need in the future for capital. If the association was going to grow X in the next year, two years, five years, then we would have to crank that into our consideration of how much capital to raise. If we felt that economic conditions were such that we might lose money. We didn't think that a lot, but that was one of the considerations. One of the considerations was that economic conditions might be such, or political conditions might be such, that minimums might be raised.

Trial Tr. at 592–93.

The capital cushion was particularly important to Home Savings after the savings and loan crisis of the 1980s. Home Savings was careful never to be in danger of falling below the regulatory minimums. According to Mr. Rinehart,

> at the time [of the savings and loan crisis] the regulators were being very aggressive with respect to evaluating loans and marking down values. So, if a regulator starts marking down the values of your loans, again that's capital going away. So you have to have some ability to absorb those kinds of things without falling below the

---

9. Cash generated from capital market sources cost substantially more than the cash raised through deposits.

minimums. So, we typically had some kind of capital cushion.

Trial Tr. at 657.

Mr. Deihl explained the consequences of falling below minimum capital requirements. He described regulators' power when a thrift fell below the regulatory minimums as "awesome." If a thrift fell below minimums, regulators could

> stop [the thrift] from taking in any new money, opening any new accounts, making any new loans . . . limit [the thrift's ability to] expand through . . . creating new branches . . . charge more for fees at one time . . . [Regulators] could even shut [the thrift] down, if eventually [regulators] didn't think that [the thrift was] going to be able to [meet capitalization requirements]. They could also . . . [require that a thrift] shrink the association.

Trial Tr. at 595.

Due to its excellent credit rating Home Savings was capable of going into the capital markets at any time to raise tangible [10] capital. Home Savings preferred, however, to raise capital when the market was most favorable. If Home Savings was forced to go to the market at the same time as all other thrifts, capital raisings would be more expensive. To avoid this, Home Savings routinely projected its future capital needs, and raised capital in advance, if the market was favorable. Mr. Rinehart explained that Home Savings "considered at the time of capital development . . . [what] would be potential growth [opportunities] for the company, [and] potential acquisitions that the company might plan on making" when deciding how much capital to raise. Trial Tr. at 647–48. Mr. Deihl testified that Home Savings attempted to raise only what it thought it would need in the near future. "What [Home Savings' management] tried to do was to not raise more than we needed, to raise as much as we needed, and to raise it at a time when it was cheapest. We weren't always

right, but those were the things we had to consider." Trial Tr. at 601.

### B. The Merger Acquisition Agreements

Rising interest rates in the early 1980s led to a reduction in the profits of most thrifts. As depositors demanded a higher rate of return, the profits on loans were drastically reduced or non-existent. Among other efforts to stabilize the industry, regulators weakened capital requirements. *Winstar*, 518 U.S. at 846, 116 S.Ct. 2432. However, thrifts continued to fail; 453 failed between 1980 and 1983. When a troubled thrift was liquidated, the government could be called upon to compensate depositors, based on its role as guarantor. It was projected that FSLIC would have needed approximately $150 billion dollars to satisfy its deposit guarantor obligations. Yet, at the time of the supervisory mergers at issue here, FSLIC had only $6 billion in reserve. *Id.* at 844–49, 116 S.Ct. 2432.

When it became apparent that FSLIC did not have funds sufficient to liquidate all troubled thrifts, FHLBB and FSLIC began to encourage healthy thrifts to take-over ailing institutions. *Id.* The court heard from witnesses who participated in those efforts. Mr. Horace Brent Beesley, Director of FSLIC from April 1981 to April or May of 1983, oversaw and participated in supervisory mergers negotiations. Mr. Beesley made recommendations on assistance agreements during this time period, including the Florida/Missouri and Texas assistance agreements relevant here. Plaintiffs also offered the testimony of the Director of the Office of District Banks at FHLBB, later the Director of the Office of Examinations and Supervision ("OES"), Dr. D. James Croft. OES was responsible for examining the books and records of thrifts to ensure compliance with banking regulations, as well as for issuing interpretations of applicable regulations. The court also heard from Mr. Richard Sanchez. Mr. Sanchez began working for OTS

---

**10.** Throughout this litigation, the parties have used the term "tangible capital" to connote any capital other than intangible supervisory goodwill. We recognize that the term has a specific regulatory meaning under contemporaneous regulations: "the amount of equity capital as deter-

mined in accordance with generally accepted accounting principles minus goodwill and other intangible assets plus qualifying subordinated debt." 12 C.F.R. 563.8–9(b)(12) (1989). We maintain the parties' broader use of the term here.

in 1989 as an Assistant District Director. Prior to that time, he worked for OTS's predecessor agency, FHLBB. Mr. Beesley, Mr. Sanchez and Dr. Croft were all knowledgeable about the practices of FSLIC and FHLBB, and were credible witnesses.

Dr. Croft explained that regulators considered supervised mergers preferable to liquidating troubled institutions. In order to attract the stronger institution to take-over the weaker institution, the regulators furnished several economic inducements, including supervisory goodwill, regulatory forbearances and waivers from regulatory requirements. These incentives were actively touted by the regulators. Mr. Beesley testified that during his time at FSLIC he traveled to California to give speeches to thrift industry representatives, hoping to encourage healthy thrifts to take-over troubled thrifts. Because nearly all of the troubled thrifts had a regulatory net worth less than zero, Mr. Beesley testified that supervisory goodwill was included in virtually every merger.[11]

At the time of the acquisitions here, Home Savings was precluded from entering other states due to restrictions on interstate operations. In connection with supervisory mergers, however, FHLBB allowed a healthy thrift to acquire troubled thrifts on an interstate basis. Taking over a troubled thrift in a supervisory merger was thus attractive to plaintiffs insofar as it allowed Home Savings to enter new markets. Nevertheless, Mr. Deihl testified that Home Savings did not wish to do so at the risk of jeopardizing its own financial stability. This was a particular concern with respect to the thrifts that FHLBB was offering. Most already had been stripped of their desirable assets. They had substantial liabilities in excess of assets. An acquiring thrift, therefore, would be required to infuse capital into the thrift in order to support the loans of the troubled thrift. Even considering the potential for entry into new markets, the financial shortcomings of troubled thrifts made them unattractive as avenues of growth.

Home Savings, then, was reluctant to take-over a troubled thrift because of the capital infusion which would have been required. The provision of supervisory goodwill as regulatory capital, however, allowed Home Savings to take-over a failing thrift while minimizing the infusion of additional capital. The more supervisory goodwill a thrift held, the larger the required capital it afforded. That, in turn, meant, as explained by Mr. Sanchez, that a thrift could use supervisory goodwill to leverage new growth, supporting a larger portfolio of deposits and loans. Supervisory goodwill thus could be factored into a thrift's capital planning, allowing it to expand with less tangible capital. Both Mr. Rinehart and Mr. Deihl made it clear that Home Savings would not have taken over troubled thrifts absent the incentive of supervisory goodwill. We believe them.[12]

Home Savings, in short, accepted the representations made and went forward with several acquisitions. On December 17, 1981, Home Savings entered into the Florida/Missouri transaction by which it acquired three failing thrifts, one in Florida and two in Missouri. On the same day, Home Savings signed an assistance agreement with FSLIC ("Florida/Missouri Assistance Agreement"). Section 16 of the Florida/Missouri Assistance Agreement integrated FHLBB Resolution 81–803 ("Florida/Missouri Resolution") which stated, in part:

> RESOLVED FURTHER, That the Bank Board hereby finds that the submission of Home [Savings] concerning the accounting treatment to be afforded its acquisition of

---

**11.** According to Dr. Croft "the acquiring institution wouldn't take-over this unhealthy institution and take on that loss, unless if felt that the value of that branch network and the value of that customer base was at least equal to ... [supervisory goodwill]." Trial Tr. at 299.

**12.** The government contends that plaintiffs grossly overstated the value of supervisory goodwill. As evidence, the government points to Home Savings filing of a notice of intent to file an application to join the FDIC, and leave FSLIC. Had Home Savings joined the FDIC, it would have lost its use of supervisory goodwill. It later became apparent, however, that the FDIC was going to take-over FSLIC anyway, and FIRREA meanwhile had enacted substantial changes in the industry. Home Savings thus never went forward with its application. We decline to draw conclusions from a notice of an intent to file which was never pursued.

Southern ... based upon [its] submission, and the circumstances described therein, the Bank Board hereby determines that it does not object to ... (2) any excess [liabilities over assets] being assigned to goodwill and initially amortized, in accordance with generally accepted accounting principles, over forty (40) years, *provided* that Home shall furnish an analysis, accompanied by a concurring opinion for its independent accountant satisfactory to the Supervisory Agent and to the Office of Examinations[.]

On January 15, 1982, Home Savings acquired two thrifts in Texas and one in Illinois: Royal Federal Savings and Loan Association of Dallas, Texas; El Centro Federal Savings and Loan Association of Dallas, Texas; and Hyde Park Federal Savings and Loan Association of Chicago, Illinois ("Texas/Illinois transaction"). As with the Florida/Missouri transaction, the parties to the Texas/Illinois transaction executed an Assistance Agreement ("Texas/Illinois Assistance Agreement") containing an integration clause incorporating contemporaneous documents. FHLBB Resolution 82–29 ("Texas/Illinois Resolution") contained language identical to that of the Florida/Missouri Resolution.

One of the key issues at the time of these acquisitions was the period over which supervisory goodwill would be amortized. The bank was interested in maintaining supervisory goodwill on its books as long as possible. Regulators had an interest in eliminating supervisory goodwill as early as possible. As to the Florida/Missouri and Texas/Illinois transactions, there is no question that plaintiffs were assured a 40 year period of amortization as part of the acquisition agreements.

On August 10, 1984, plaintiffs acquired Century Federal Savings and Loan Association of Long Island, New York ("Century transaction"). The parties entered into an assistance agreement on the same day. ("Century Assistance Agreement"). The Century Assistance Agreement contained a clause that integrated FHLBB Resolution 84–415 ("Century Resolution"). FHLBB also issued a net worth deficiency forbearance to Home Savings on August 10, 1984, stating that it would forbear from requiring Home Savings to meet statutory reserve and net worth requirements arising from Century for five years.

On May 22, 1985, plaintiffs acquired several Ohio thrifts, including Home Federal Savings and Loan Association, a federally insured thrift located in Ohio ("Ohio transaction"). On May 22, 1985, FSLIC and Home Savings entered into an assistance agreement regarding the acquisition ("Ohio Assistance Agreement"). As with the Century transaction, FHLBB issued a net worth deficiency forbearance which ran for five years.

The parties disagree as to the length of amortization agreed on for the Century and Ohio transactions. In that connection, the Ohio Assistance Agreement included an integration clause which incorporated FHLBB Resolution 85–393 ("Ohio Resolution"). The Century and Ohio Resolutions both made reference to generally accepted accounting principles ("GAAP"), requiring their use as "prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC." The Ohio resolution, which is virtually identical to the Century Resolution, also provided, in part:

RESOLVED FURTHER, That Home Savings shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants, satisfactory to the Principal or other Supervisory Agent of the Bank Board, San Francisco, California ... and to the Office of Examinations and Supervision, which ... (ii) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods.

Unlike the preceding acquisitions, therefore, the parties agreed in the Century and Ohio transactions on a means to fix the amortization period at a later date.

C.   Reacting to the Passage of FIRREA

FIRREA became law on August 9, 1989. In addition to other regulatory changes, FIRREA disallowed, on a phase-out basis,

the use of supervisory goodwill to meet regulatory capitalization requirements.[13] Prior to the disallowance of supervisory goodwill in 1989, Home Savings was entitled to use $402.8 million in supervisory goodwill. By January 1, 1995, use of all of Home Savings' supervisory goodwill was barred as a result of FIRREA.

Additionally, FIRREA imposed new, more stringent capital requirements on thrifts and set up three new categories of capital standards; tangible, core, and risk-based.[14] Each of these were calculated based on separate criteria, with different capital ratios. For instance, risk-based capital included any capital raised by means of subordinated debt. That same subordinated debt, however, did not count towards a thrift's core capital ratio.

Capital requirements were later further altered by the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, 105 Stat. 2236 ("FDICIA"), enacted on December 19, 1991. FDICIA drew a regulatory distinction between a thrift which was adequately capitalized at a three percent capital ratio and one well-capitalized at five percent. Thrifts which were well-capitalized were entitled to more favorable treatment from regulators. For instance, a well-capitalized bank had lower deposit insurance premiums.

After the passage of FIRREA, bank regulators became concerned that Home Savings was insufficiently capitalized. Mr. Sanchez met with Home Savings' representatives to aid it in determining how to meet the new capital requirements. As Mr. Rinehart testified, it was Home Savings' "understanding that the supervisory goodwill was being eliminated over a period of years, phased out, which meant that we were going to have to replace it with traditional capital." Trial Tr. at 646. Because of the loss of supervisory goodwill, thrifts such as Home Savings were required to make adjustments in their capital planning to ensure that they continued to

meet target capital ratios. A thrift could choose to replace supervisory goodwill through retained earnings, by raising market capital, by choosing not to expand or by shrinking its operations.

Despite what was happening due to FIRREA and changes in regulatory requirements, the level of capitalization Home Savings wanted to achieve was not directly affected. As we noted above, both before and after FIRREA Home Savings made a business judgment as to the level it wanted to maintain. Mr. Deihl confirmed that Home Savings continued to maintain the same capital target, even after the passage of FIRREA. He testified that the target capital level:

> didn't have much to do with FIRREA or FDICIA. What it had to do with was our need for capital in the future, as we perceived it. We had to have more than the minimum, we had to have more for all of the reasons that I outlined, to grow, to take advantage of opportunities, and protect ourselves from loss or raising of minimums.

Trial Tr. at 594.

The problem which the loss of supervisory goodwill created, therefore, was the enlarged gap between where Home Savings was and where it wanted to be with respect to capitalization. Consequently, the bank made a number of adjustments because of its increasing inability to count supervisory goodwill as regulatory capital. For example, Mr. Deihl testified that under the new requirements, real estate assets had to be separately capitalized at very high ratios. Thrifts were required to maintain one dollar in capital for each dollar invested in real estate assets. Real estate holdings thus ceased to be profitable for Home Savings. One of Home Savings' adjustments was to restructure or sell off much of its real estate holdings. Home Savings sold its real estate subsidiaries in

---

**13.** Thrifts were given a period of time to make the adjustments necessary to meet new capital requirements. Once partial compliance standards were met, an institution was considered by regulators "fully phased-in." However, regulators took action against those thrifts which were not fully phased-in, even in advance of

FIRREA's deadlines. Regulators could restrict, for instance, the thrift's ability to pay dividends, or make acquisitions.

**14.** Plaintiffs' claims are not directed at the higher capital requirements.

September 1992, for a $316 million "impact"[15] on its core capital ratio and a $455 million impact on its risk-based capital ratio.

Further, Home Savings acquired Home Savings Bank of New York ("Home New York") in November 1990 in a stock for stock transfer. Home New York held capital in excess of its liabilities.[16] The acquisition of Home New York thus had a positive $135 million "impact" on Home Savings' tangible, core and risk-based capital. In May 1990, Home Savings restructured the mortgage investments it held through Fannie Mae. This restructuring had a $180 million impact on Home Savings' risk-based capital ratio. Additionally, Home Savings restructured $2.7 million in mortgages which it held with Freddie Mac in December 1990. This had a $145 million impact on its risk-based capital.[17]

Home Savings also obtained new capital. From December 1989 through October 1990, and again in November of 1993, Home Savings issued a total of $950 million in subordinated debt. FIRREA's requirements did not allow this subordinated debt to count towards Home Savings' risk-based capital requirement. It nevertheless had an effect on Home Savings' core-based capitalization.[18] At the end of the day, however, these adjustments were insufficient to fill the gap created by the loss of supervisory goodwill.

As Home Savings' parent company, the capital raised by Ahmanson could be counted towards all Home Savings' capital requirements regardless of its source. Ahmanson, therefore, undertook a series of market-based capital raisings motivated in part by the desire to push capital down to Home Savings. In November 1989 Ahmanson raised $250 million in subordinated debt. In September 1991 Ahmanson raised $169.1 million in preferred stock. In February 1993, it raised an additional $188.4 million in preferred stock. After each of these capital raisings, Ahmanson contributed all the capital raised to Home Savings. In August 1993, Ahmanson raised $280.7 million in convertible preferred stock. Of this, $141.0 million was infused into Home Savings. In August 1994, Ahmanson raised $125.0 million in subordinated debt, $100 million of which went to Home Savings. These efforts admittedly were driven in part by capital needs other than simply the replacement of supervisory goodwill. In all, Ahmanson infused nearly $850 million into Home Savings, a portion of which went to replace $334 million in supervisory goodwill.

From the above facts, plaintiffs claim damages from the cost of replacing regulatory capital in the form of supervisory goodwill with tangible capital. They have offered a model, prepared by Dr. Stewart Myers, claiming damages in the amount of $80,936,000, which, when grossed-up for taxes, amounts to $134,045,000. We will examine his model after first considering the facts underlying some of the government's defenses.

## D. Application of Generally Accepted Accounting Principles

We first consider two threshold matters. The first involves the amortization period arising out of the Century and Ohio transactions. Plaintiffs claim these acquisitions were, like the Florida/Missouri and Texas/Illinois transactions, entitled to a 40 year amortization period for supervisory goodwill. Defendant contends that the Century and Ohio transactions were subject to level-yield amor-

---

**15.** From the testimony and exhibits it is unclear whether the impact here is a reduction in the need for capital or an increase in the amount of capital available to plaintiffs. Nevertheless, it is clear that impact connotes a better capital position.

**16.** Mr. Rinehart testified that Home Savings paid more for Home New York than it otherwise would have because Home New York had excess capital. However, because this was a stock-for-stock merger, the actual amount of over-payment is nearly impossible to gauge.

**17.** This large improvement in Home Savings' risk-based capital ratio from the relatively small $2.7 million restructuring of Freddie Mac mortgages was due to their riskier nature. The mortgages with Freddie Mac were exchanged for relatively less risky mortgage-backed securities, which required significantly less capital support.

**18.** Because subordinated debt raised by Home Savings counted only towards core capital, it is not included within Home Savings' damage model.

tization for a maximum of 8 to 12 years. This matters, because a shorter amortization period means that supervisory goodwill would have been eliminated at some early point, irrespective of FIRREA.

The second dispute concerns the extent to which plaintiffs' post-FIRREA sale of branches acquired in the assistance agreements compelled a write-down of supervisory goodwill. Although we ultimately conclude that GAAP principles do not affect the outcome, both disputes potentially involve the application of GAAP. In order to better outline the parties' arguments, we delineate a brief background.

GAAP represents those accounting principles adopted by the Federal Accounting Standards Board ("FASB"). GAAP changes as FASB promulgates new standards. While the FASB is not a governmental agency, GAAP, as promulgated by FASB, is the standard for reporting to some governmental agencies, such as the SEC.

With the savings and loan crisis of the 1980s, regulators "developed new 'regulatory accounting principles' ('RAP') that in many instances replaced [GAAP] for purposes of determining compliance with its capital requirements." *Winstar,* 518 U.S. at 846, 116 S.Ct. 2432. RAP comprises regulators' requirements for thrifts' accounting practices when filing with FHLBB. In effect, RAP became a specialized set of standards unique to thrifts. Home Savings thus was required to maintain two separate sets of books, one based on GAAP for SEC filings, and another based on RAP for filings with FHLBB. Under RAP, a thrift could be given variances from GAAP, including amortization of supervisory goodwill for as long as 40 years.

Prior to September 30, 1982, there had been no difference between GAAP and RAP accounting for goodwill. All thrifts operated under Accounting Principles Board [19] Opinion No. 17: *Intangible Assets* ("APB 17"). APB 17 allowed amortization of supervisory goodwill for a period of up to 40 years. Regulators allowed the same amortization period for regulatory purposes. After September 30, 1982, however, the thrift industry was required, for GAAP purposes, to follow Federal Accounting Standards Board Statement No. 72: *Accounting for Certain Acquisition of Banking or Thrift Institutions* ("FASB 72"). FASB 72 explains that supervisory goodwill occurs when enterprises which "acquire banking and thrift institutions pay a premium to gain entry into new markets, to acquire established branches with existing customer relationships, to acquire an existing deposit base, and for other factors." FASB 72 at ¶ 28. Supervisory goodwill, under FASB 72, was to be amortized for an approximate maximum of eight to twelve years, on a level yield basis. Under RAP, however, a thrift could amortize the same supervisory goodwill by any contractually-guaranteed schedule.

The parties put forward dueling accountants to examine the application of RAP and GAAP to the present facts. Mr. Mark O'Mara testified for plaintiffs. He is a senior manager and CPA with Ernst & Young. He began his career at KPMG, but left to work for the regional accounting department at OTS in October 1989. In the regional accounting department, Mr. O'Mara primarily served as a technical accounting resource for thrift examiners, providing advice with respect to accounting practices. Mr. Thomas Randlett testified for the government. Mr. Randlett began his career at KPMG, becoming a partner in 1977. During his time as partner he concentrated on financial institutions, including thrifts. After leaving KPMG in 1989, Mr. Randlett became a consultant for Midland Bank in New York. Very shortly thereafter, he joined LECG, LLC. Both men were competent, disinterested and reliable.

Ms. Helen Lin, plaintiffs' witness, testified with respect to Home Savings' actual accounting practices. Ms. Lin was an account manager for Home Savings from 1981 to 1986. In that capacity, Ms. Lin was responsible for filing FHLBB and OTS reports with regulators. She later served as the assistant corporate comptroller and as a vice president of Home Savings from 1986 until Home Sav-

---

**19.** The Accounting Principles Board is the immediate predecessor to the Financial Accounting Standards Board. Like the Financial Accounting Standards Board, the Accounting Principles Board was a standard setting body for accounting practices.

ings was acquired by Washington Mutual in September 1999. Ms. Lin was well-versed in Home Savings' financial practices, as well as the applicable accounting principles. The court found her to be a credible witness.

### 1. Amortization Period for the Century and Ohio Transaction

██ While the Century and Ohio Assistance Agreements on their face did not establish a specific amortization period, both the Century and Ohio Resolutions set out the process by which the amortization period was to be determined and incorporated into the contract. Home Savings was to provide the regulators with an analysis, supported by independent auditors, which included the proposed amortization period for supervisory goodwill arising from those transactions. The resolutions do not indicate what actions the regulators could take, but it is a fair inference that the proposal could be challenged.

Plaintiffs were unable to provide the court with a copy of the analysis performed pursuant to the Century and Ohio Resolutions. Plaintiffs urge that it is inconceivable, due to the importance of supervisory goodwill and its impact on regulatory capital, that the parties left the regulatory amortization period unresolved. Some amortization period had to be employed in any event. Plaintiffs argue that circumstantial evidence demonstrates that such an analysis was furnished at the time and that the schedule adopted by the bank and regulators called for 40 year amortization. We agree.

The evidence shows that plaintiffs did, in fact, report the declining supervisory goodwill balance in their regulatory filings on a 40 year amortization schedule. As evidence of their amortization schedule, plaintiffs put forward their accounting practices. Home Savings was required to file a monthly and quarterly thrift financial report ("TFR") with

banking regulators, reporting, among other information, the amount of supervisory goodwill which it counted toward regulatory capital. However, the amortization schedule for supervisory goodwill was not determinable from the face of the TFR. Instead, the underlying calculations for the TFR were reflected on an internally prepared form H3, which was not filed with regulators. The H3 reflected supervisory goodwill for each individual thrift which Home Savings had acquired. Ms. Lin testified that Home Savings was required to prepare both the TFR and H3 in accordance with RAP.[20]

Plaintiffs urge that based on routine audits, regulators knew that Home Savings amortized the supervisory goodwill arising out of the Century and Ohio transactions over 40 years.[21] Dr. Croft confirmed this when he testified that it was the practice of FHLBB to examine an institution and its H3 to insure that it was amortizing goodwill in the manner which FHLBB had approved. These audits occurred every 18 months, and plaintiffs' internal documents were highly scrutinized.

Defendant counters that both the Century and Ohio transactions provided that Home Savings would follow GAAP principles. In that event, in the absence of a clear contract term, Home Savings was required, under GAAP provisions applicable at the time, to employ level yield amortization over a maximum of approximately eight to twelve years. Defendant asserts that these requirements controlled RAP. Thus, whatever was required for GAAP filings was also required for filings under RAP. Any damages model put forward by plaintiffs thus would have to reflect the shorter amortization period.

As an illustration of the regulators' knowledge of Home Savings' amortization schedule, Ms. Lin pointed to a disagreement in August 1989 about the amortization schedule for Hyde Park Federal Savings and Loan,

---

**20.** Home Savings was also required to file a form H2 with regulators, providing financial statements as prepared for the SEC, in accordance with GAAP. 12 C.F.R. § 563c.23–1(a)(3) (1988).

**21.** Mr. O'Mara prepared an amortization schedule for this trial based on his reading of Home Savings' supervisory goodwill amortization

schedule actually employed on its H3. He concluded that the bank and regulators used a straight line 40 year amortization period for all transactions, including the Century and Ohio transactions. Mr. O'Mara used the supervisory goodwill numbers found on the H3 for the schedule he prepared for trial.

which was part of the Texas/Illinois transaction. For a time, there were two entries for Hyde Park Federal on Home Savings' H3. The separate entries reflected the regulators' and Home Savings' positions with respect to the appropriate amortization period. The dispute was eventually resolved and Hyde Park Federal Savings and Loan's supervisory goodwill was amortized over 40 years.

Mr. Beesley testified that supervisory goodwill was routinely included with supervisory mergers. In general, a thrift would propose an amortization period, subject to approval by FHLBB and outside auditors. If the independent auditors accepted the amortization period, FHLBB would as well. Once agreed upon, the amortization length became part of the contract through the prior resolutions.

Regulators were aware of Home Savings' treatment of supervisory goodwill for the Century and Ohio transactions from routine examinations of plaintiffs' accounting practices. Indeed, it is unreasonable to believe that regulators would have allowed Home Savings to amortize supervisory goodwill over a 40 year period absent an understanding that this was the implementation of the process agreed upon in the Century and Ohio Assistance Agreements. We find from the circumstantial evidence that the parties agreed to a 40 year amortization schedule for all the acquisitions, including Century and Ohio.

2. Sale of Branches

From 1993 to 1995, Home Savings sold the branches which it had acquired through the supervisory mergers. Defendant argues that GAAP required plaintiffs to write-off supervisory goodwill upon the sale of the remaining branches initially acquired in the supervisory mergers. As with its argument with respect to the amortization of the Century and Ohio transactions, defendant urges that GAAP governed as against RAP and the contract provisions. Plaintiffs disagree, citing the Federal Circuit decision in *LaSalle Talman v. United States*, 317 F.3d 1363 (Fed.Cir.2003), they contend that, because the branch sales are subsequent to the breach, they are irrelevant to our consideration of damages. In addition, they argue that the contract assured plaintiffs the right to rely upon supervisory goodwill, irrespective of the application of GAAP to future transactions. Finally, plaintiffs argue that their treatment of supervisory goodwill subsequent to the branch sales was appropriate under GAAP. Although we ultimately agree with plaintiffs that the defense fails as a matter of law, we set out the relevant facts for context.

In November 1993, Home Savings began the sale of the Missouri branches it acquired in the Florida/Missouri transaction. It sold the last Florida branch acquired in the Florida/Missouri transaction in July 1998. In November 1994, Home Savings sold all of the Illinois branches it acquired in the Texas/Illinois transaction. Home Savings sold the last of the branches it acquired in the Ohio transaction in January 1995. In September 1995, Home Savings sold the last of the state branches it acquired in the Century transaction. According to Mr. Rinehart, except in Ohio, Home Savings no longer had a depository presence in any of these states, after selling the branches. However, Home Savings maintained loan offices in those states where depository branches had been sold, and loans which had been previously made were retained and continued to generate income.

Mr. O'Mara explained how Home Savings actually adjusted supervisory goodwill, on a GAAP basis, as a result of the branch sales. After the sale of branches in Missouri, Home Savings wrote-down $6 million in supervisory goodwill in December 1993 on a GAAP basis against the gain realized on the branch sales.[22] That left Home Savings with $39

---

22. Mr. O'Mara pointed out that the schedule Ms. Lin provided in discovery was mistaken in that it reflected that Home Savings actually wrote off all remaining goodwill for this transaction as of December 1993. Mr. O'Mara pointed out that Ms. Lin's schedule incorrectly showed supervisory goodwill remaining on Home Savings' books after the Florida/Missouri branch sales, where the supervisory goodwill had already been disallowed. Mr. O'Mara based his testimony on Home Savings' TFR as filed with OTS and its 10–K filed with the SEC. We find that this error does not undercut Ms. Lin's credibility or recall.

million in supervisory goodwill still remaining, arising from the Florida/Missouri transaction.[23] When it sold branches in Ohio, Home Savings wrote off an amount of supervisory goodwill equal to the gain that it received on the sale of the branches, or $8 million. Home Savings maintained the $13 million in supervisory goodwill which remained from the Ohio transaction.

It is important to understand that, as Home Savings was selling off these branches, its ability to count supervisory goodwill toward regulatory capital was simultaneously phasing out due to FIRREA. By the beginning of fiscal year 1995, supervisory goodwill no longer counted toward regulatory capital requirements. Home Savings wrote off the balance of its $101.8 million in supervisory goodwill on a GAAP basis at the end of 1994 by retroactively applying FASB 72 to the Florida/Missouri and Texas/Illinois transactions.[24] This retroactive application effectively eliminated all remaining supervisory goodwill on a GAAP basis. Mr. Rinehart testified that this write-off merely reflected what had already been required by FIRREA on a RAP basis.

In September 1995, Home Savings sold the last of the New York branches it acquired in the Century transaction. Home Savings sold the last of the Florida branches it obtained through the Florida/Missouri transaction in 1998. Because FIRREA previously had disallowed Home Savings' ability to count supervisory goodwill as regulatory capital, and Home Savings had already written off supervisory goodwill on a GAAP basis, neither the Florida nor Century branch sales had any further effect on Home Savings' recording of supervisory goodwill. Ms. Lin testified that Home Savings' independent auditors KPMG Peat Marwick ("KPMG") issued a letter to Home Savings' board of directors, indicating that KPMG approved of Home Savings' treatment of the supervisory goodwill after the branch sales.

## DISCUSSION

The "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties" furnish the appropriate measure of damages in a *Winstar* breach of contract case. *Winstar,* 518 U.S. at 870–71, 116 S.Ct. 2432. Plaintiffs here seek damages in the form of cost of cover, a form of expectancy damages. *See Hughes Comm. Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed. Cir.2001). Specifically, plaintiffs claim the cost of replacing contractually-guaranteed supervisory goodwill with tangible capital. *See Bank United of Tex. v. United States,* 50 Fed.Cl. 645, 665 (2001) (when recovering expectancy damages, "[p]laintiffs are entitled to recover their actual costs incurred in mitigation of the lost leverage capacity caused by FIRREA").

### I. Amortization of Supervisory Goodwill

Prior to examining the appropriateness of plaintiffs' model, we address two threshold defenses brought by defendant. Defendant first argues that plaintiffs' damages must be reduced to reflect a maximum twelve year amortization period for supervisory goodwill stemming from the Century and Ohio transactions. Next, defendant argues that plaintiffs were required to follow

---

**23.** Defendant offered evidence of a dispute between the Internal Revenue Service ("IRS") and Home Savings regarding the tax implications of Home Savings' sale of the branches it acquired through the supervisory mergers. The government asserts that statements made in the IRS dispute—that the only tax benefit Home Savings received in the mergers was the acquisition of interstate branches—contradicts Mr. Rinehart's and Mr. Deihl's statements that supervisory goodwill was valuable, as well as Mr. O'Mara's testimony with respect to when supervisory goodwill must be written off. We disagree.

The statements which the government points to are in litigation documents and are not contrary

to the statements made to this court. Further, the nature of the tax benefits to Home Savings is not directly at issue in this case. Thus, that Home Savings represented to the IRS that the tax benefits from the supervisory mergers were simply interstate branching rights in no way undercuts its argument here. Finally, the IRS rejected Home Savings' argument, finding that Home Savings, in fact, received other benefits from the mergers. We do not second guess that decision here.

**24.** While it reported to FHLBB supervisory goodwill on a straight line basis, it utilized level yield amortization for the Ohio and Century transactions when filing with the SEC.

GAAP with respect to writing-off supervisory goodwill after it sold off branches acquired in the assistance agreements.

### A. Century and Ohio Transaction Amortization Period

■ We have found above that the parties agreed to a 40 year amortization schedule. Once the amortization period was agreed upon by the parties, it was fixed, making GAAP requirements irrelevant. *Winstar*, 518 U.S. at 868, 116 S.Ct. 2432. Because the length of amortization was fixed by contract, it is therefore unnecessary to address defendants' argument that both RAP and GAAP required plaintiffs to amortize supervisory goodwill over a shorter period of time.

### B. Write–Down of Supervisory Goodwill Due to Branch Sales

■ It follows from our finding that the amortization period was fixed by contract that we reject defendant's argument that plaintiffs were required by GAAP to write-down supervisory goodwill in connection with branch sales. The 40 year contract term governs. It is therefore unnecessary to address Home Savings' alternative argument that its treatment of supervisory goodwill was appropriate under GAAP.

There is an additional reason why the branch sales should not be taken into account. The Federal Circuit's decision in *LaSalle Talman* councils against lessening damages based on post-breach occurrences. *LaSalle Talman*, 317 F.3d at 1373 (citing *S. Pac. Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918)). *LaSalle Talman* was also a *Winstar* case. There, the circuit court determined that the trial court improperly offset damages by profits attributable to capital infusions which occurred after the government's breach. *Id.* at 1373 ("[U]nrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong.") (citing *S. Pac. Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918)).

Here, the branch sales occurred well after the passage of FIRREA. The first sale did not occur until November 1993, over four years after defendant's breach. Prior to the sales, in other words, the utility of supervisory goodwill from a regulatory standpoint, had virtually disappeared and was on its way to a complete phase-out. It would, therefore, be impossible to determine how plaintiffs would have done with respect to branch sales, had the breach not occurred.

### II. Plaintiffs' Claim for the Cost of Replacement Capital

Plaintiffs put forward a cost of replacement capital model to show damage from the loss of supervisory goodwill. Plaintiffs claim that they replaced supervisory goodwill with tangible capital in order to maintain an independently-determined level of regulatory capitalization.

### A. Threshold Defenses

We begin our discussion by outlining two threshold defenses advanced by defendant. Each relates to whether plaintiffs may bring a claim for replacement costs, or whether their recovery is limited to transaction costs. While closely related, they are distinct defenses. The first defense is legal. Defendant argues, based on previous opinions of the Federal Circuit, that the plaintiffs are barred as a matter of law from recovering anything other than transaction costs. The second defense is that, based on economic and financial principles, it is impossible for plaintiffs to prove that they were harmed in any manner other than by incurring transaction costs. Were defendant to succeed with either defense, plaintiffs could not succeed with their replacement cost model. For the reasons set out below, however, we cannot accept either defense.

#### 1. Limiting Recovery to Transaction Costs

■ Defendant maintains that this court and the Federal Circuit have limited damages for the cost of replacement capital as a matter of law to transactional costs, such as brokerage fees. It points to the rejection of similar models in *Bank United of Texas v. United States*, 50 Fed.Cl. 645, 654–55 (2001); *California Federal Bank v. United States*, 43 Fed.Cl. 445, 461 (1999); *Glendale Federal*

*Bank v. United States,* 43 Fed.Cl. 390, 398 (1999), *rev'd in part, aff'd in part,* 239 F.3d 1374 (Fed.Cir.2001); and *LaSalle Talman Bank v. United States,* 45 Fed.Cl. 64 (1999), *rev'd in part, aff'd in part,* 317 F.3d 1363 (Fed.Cir.2003).

In *Bank United,* the cost of replacement capital model was based on the maximum amount of assets that could have been leveraged by supervisory goodwill. Plaintiffs then brought a damages claim for the cost of raising the capital that would have been necessary for that level of assets, using a hypothetical capital raising. The court rejected the amount claimed as inherently improbable. Plaintiffs sought $1.207 billion in damages to replace $451 million in supervisory goodwill. *Bank United,* 50 Fed.Cl. at 656.

In *Glendale,* the court also criticized plaintiffs' claim for lack of proof, because their witnesses had taken inconsistent positions during the litigation. *Glendale,* 43 Fed.Cl. at 398. The trial court's finding was upheld on appeal. *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001).

In *California Federal Bank v. United States,* the trial court determined that plaintiffs' expert was not credible. It allowed no recovery beyond transaction costs, and that decision was affirmed by the Federal Circuit, which saw "no clear error in the court's factual finding that the flotation costs provided an appropriate measure of Cal Fed's damages incurred in replacing the supervisory goodwill with tangible capital." 245 F.3d 1342, 1350 (Fed.Cir.2001).

None of these cases, in short, rejected a claim for the cost of replacement capital on the basis that it was legally unrecoverable. In each instance, the claims failed on the merits. Defendant's assertion that we must limit plaintiffs' recovery to transaction costs as a matter of law is therefore incorrect.

Our interpretation of these decisions is in concert with the Federal Circuit's recent decision in *LaSalle Talman,* 317 F.3d 1363 (Fed.Cir.2003). There, the plaintiff sought to recover what it paid its parent company for replacement capital. Plaintiff claimed damages based on the spread between an imputed return on the investment and the average

cost of the thrift's funds. The Federal Circuit reversed the trial court's refusal to address this model, but also held that plaintiffs' actual experience raising capital could be utilized to determine cost of capital. The court held that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the Winstar context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill." *Id.*

## 2. Net Present Value Zero Analysis

Defendant also offers an economic rationale for its assertion that damages for the cost of replacing capital are limited to transaction costs. It argues, based on the expert testimony of Dr. Richard Leftwich, that any capital raising, by definition, could not have had a net cost to plaintiffs. Dr. Leftwich is the Fuji Bank and Heller Professor of Accounting and Finance in the Graduate School of Business at the University of Chicago. Throughout his career he has taught courses in financial statement analysis, investment, financial strategy and the principles of financial economics. He is the co-editor of the Journal of Accounting Research and has served on the boards of several other scholarly journals. He has published articles primarily on the effects of information on capital markets. The court has no basis to doubt Dr. Leftwich's competence as an expert, although we ultimately reject his analysis.

Dr. Leftwich characterized the government's defense as a net present value ("NPV") zero theory. He believes that, in an arm's length transaction, an investor receives from the corporation the equivalent value of what is invested:

> That's what the zero net present value transaction is. Its that-that you have something that is worth $100 today and you owe something that is worth $100 today ... [Y]ou've given me $100 million and I've promised to pay you back $100 million. That's a wash. That's what we mean by zero [net present value] transaction. It's a fair deal for both of us. It doesn't make either of us better or worse off.

Trial Tr. at 2242. This proposition is true regardless of whether the interest rate is five percent or thirty percent, according to Dr. Leftwich. The reverse is also true. So long as the thrift pays at the market rate, it has not been harmed.

Dr. Stewart Myers was plaintiffs' expert witness. Dr. Myers is the Gordon Y. Billard Professor of Finance at the Massachusetts Institute of Technology Sloan School of Management and a research associate of the National Bureau of Economic Research. He has published widely in the field of economics, including a leading textbook on the principles of corporate finance. We found Dr. Myers to be a reliable and competent witness.

Dr. Myers acknowledged that the NPV zero method is a mechanism for determining whether an investor receives equal value for an investment from the corporation. Thus, an investor should receive a return which adequately compensated it for the risk of investment. Yet, Dr. Leftwich's analysis does not address, according to Dr. Myers, the cost to the corporation for "accepting" the investment.

Dr. Myers provided an illustration. His hypothetical involves an individual who takes out a 6.9%, 30 year, mortgage for $333,000. Over time, the mortgage company receives back what it invested, $333,000, and compensation for the use of the money, plus for the risk it took that the mortgagee would not meet his obligations. The mortgagee, however, is required to pay not only the $333,000, but also interest payments over 30 years, totaling $631,582. Dr. Myers argued that to determine whether there is a cost to the mortgagee in taking out the mortgage, we would have to consider total payments, not simply whether the mortgage company received its principal, as Dr. Leftwich urges.

As an economic abstraction, in other words, such a transaction consists of value given and value received, presumably equal. According to Dr. Myers, however, there is a cost associated with paying for capital, like the cost of borrowing for a mortgage, and it varies depending on the amount of dividends or interest paid. The "borrowing" company has to pay a dividend or interest to the investor for the privilege of utilizing its money. Even though the transaction would be a fair exchange at the time, and even though the investor may eventually end up with the return of its principal, some transactions simply cost more to the recipient than others.

This issue, in any event, was squarely addressed in *LaSalle Talman*. The Federal Circuit there upheld the trial court's rejection of what defendant again argues here. It held that the "cost of capital is the required rate of return on various types of financing... An investor does not make a gift when the expected payment is dividends out of future earnings. All capital raised by a corporation has a cost, and it is well established that the payment of dividends is a capital cost." *LaSalle Talman*, 317 F.3d at 1375 (internal citations omitted) (citing JAMES VAN HORNE & JOHN M. WACHOWICZ, JR., FUNDAMENTALS OF FINANCIAL MANAGEMENT 387 (10th ed.1998);, *Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508, 515 (9th Cir.1990)). We therefore reject Dr. Leftwich's proposed limitation based on the NPV zero theory.

### B. Plaintiffs' Model

Plaintiffs seek to recover the cost of replacing supervisory goodwill with tangible capital. They contend that a series of previous capital raisings, followed by retention of earnings, will be necessary to "fill" the hole left by the elimination of supervisory goodwill. Plaintiffs claim that the cost of these capital raisings and the future retention of earnings as capital will be $80,936,000.

### 1. Amount and Cost of Replacement from Actual Capital Raisings

Dr. Myers offered plaintiffs' damage model. It was based on a critical factual assumption, namely, that supervisory goodwill disallowed by FIRREA was replaced by an equal amount of tangible capital. More specifically, he assumed that Home Savings did not alter its business practices due to the government's breach. In other words, he accepted the testimony of plaintiffs' witnesses that Home Savings made decisions with respect to target capitalization based on deposit levels and investment opportunities, as well as

other factors; that its target capital level did not change as a result of the elimination of supervisory goodwill. Investment opportunities and the desired levels of assets and deposits remained the same, whether supported by supervisory goodwill or tangible capital. The only alteration Home Savings made to its capital raising efforts insofar as the breach was concerned, according to Mr. Deihl, was that it raised additional capital to replace supervisory goodwill.

This factual assumption is challenged by the government's expert, Dr. Leftwich. He has prepared an expert data analysis which he believes demonstrates that Home Savings did not, in fact, replace supervisory goodwill with new capital. It is based on an evaluation of the capital cushion the bank maintained before and after FIRREA. Dr. Leftwich believes that the cushion shrank, indicating that the bank simply chose to react to FIRREA by operating with a smaller capital cushion. Before we address this challenge to Dr. Myers factual assumption, however, and Dr. Myers' reaction to it, we will set out plaintiffs' claim.

Plaintiffs could not replace supervisory goodwill with an identical commodity.[25] It was not commercially available. Consequently, it had no choice but to replace supervisory goodwill with tangible, market capital. (Or, as we explain later, by retaining earnings.) Dr. Myers' damages model was based on the difference between what Home Savings paid for supervisory goodwill, namely, zero,[26] and what it cost plaintiffs to generate that new capital.

One of the consequences of being unable to "buy" supervisory goodwill, however, is that the new, market capital (or retained earnings) was different in character from supervisory goodwill. What they had in common was that a book entry could be made on Home Savings' capital ledger to support regulatory capital demands. Where they differed, in addition to the cost of market capital (or retained earnings), is that the latter was a tangible asset. It had value beyond merely propping up the capital ledger. As we explain later, Dr. Myers attempted to reflect this difference by crediting the government to the extent that plaintiffs benefitted from that aspect of the new capital which was most like the old supervisory goodwill, something he refers to as the "safe rate." [27]

Dr. Myers began by determining the amount of supervisory goodwill associated with the transactions at issue. He then deducted an amount in accordance with this court's ruling in *Home Savings II*, 51 Fed.Cl. 487, disallowing recovery for state insured Ohio thrifts. At its height in 1995, $333,193,000 in otherwise useable supervisory goodwill was disallowed.

Dr. Myers based his model on a 40 year amortization schedule running from the breach in 1989 to 2025, when the last of Home Savings' promised supervisory goodwill was amortized.[28] After amortizing, by 2025, Home Savings would have only $3,000,000 in supervisory goodwill remaining.

In order to determine what it cost plaintiffs to replace capital, Dr. Myers examined the five capital raisings undertaken by Ahmanson between November 1989 and No-

---

**25.** Where there is no ready market for the good promised, such as supervisory goodwill, " 'value' is still determined by ascertaining what plaintiff would have to pay to another person ... to obtain an identical performance." JANE M. FRIEDMAN, CONTRACT REMEDIES § 1.1, 8 (1981).

**26.** Whatever plaintiffs paid for supervisory goodwill was embedded in the original exchange. The elimination of supervisory goodwill, however, did not eliminate any contract costs for plaintiffs. It got nothing, in other words, in exchange for the loss of supervisory goodwill, at least nothing that was unique to it.

**27.** Dr. Myers modified his previous example to illustrate this principle. The thrift would main-

tain $950 in deposits, and $975 in mortgages. However, it no longer has $25 in supervisory goodwill. Supervisory goodwill is replaced by $25 in preferred equity, joining the existing $25 equity. In order to place the balance sheet in the same position as it had been prior to the replacement of supervisory goodwill, plaintiffs must carry additional assets in the amount of $25. Dr. Myers proposes that the closest analog to the $25 supervisory goodwill which Home Savings previously held is an asset raised with the same cost as the safe rate.

**28.** As we discussed *supra*, Home Savings' amortization schedule was fixed as a matter of contract. We reject defendant's arguments with respect to any amortization schedule other than 40 years.

vember 1999.[29]  He developed a chart displaying the relevant information for each. The chart, Exhibit F to his expert report, as seen below, displays dollars in thousands.[30] It shows the amount initially raised by Ahmanson, how much was infused into Home Savings, and the pre-tax cost. He also included the dates of issue as well as the dates of retirement or redemption. The latter dates are relevant, because once the issue was repaid or redeemed, it could not count toward regulatory capital.

| | | Nov-89 Subordinated Debt [1] | Sept-91 Preferred Equity [2] | Feb-93 Preferred Equity [3] | Aug-93 Convertible Preferred Equity [4] | Aug-94 Subordinated Debt [5] |
|---|---|---|---|---|---|---|
| [a] | Total Capital Raised by Ahmanson | 250,000 | 169,100 | 188,403 | 280,732 | 125,000 |
| [b] | Amount of Capital Infused into Home | 250,000 | 169,100 | 188,400 | 141,000 | 100,000 |
| [c] | Pre-tax Cost | 9.875% | 9.600% | 8.400% | 8.241% | 7.875% |
| [d] | Date Issued | Nov-89 | Sept-91 | Feb-93 | Aug-93 | Aug-94 |
| [e] | Repayment/Redemption Date | Nov-99 | Sept-96 | Mar-98 | Sep-98 | Sep-04 |

The total amount of capital raised by Ahmanson and Infused into Home Savings was nearly $850 million. Both Mr. Deihl and Mr. Rinehart acknowledged that not all this amount was needed to replace disallowed supervisory goodwill. Instead, the capital raisings were also prompted by the need to satisfy non-breaching provisions of FIRREA, as well as for business reasons such as growth opportunities. What is critical to plaintiffs' claim, however, is that Ahmanson says it raised more capital than it otherwise would have because of the loss of supervisory goodwill following FIRREA.

Because supervisory goodwill was disallowed over time and not immediately, Exhibit E to Dr. Myers' expert report matches the loss of supervisory goodwill with subsequent replacement by new capital.[31] The first column reflects the amount of lost supervisory goodwill for each year. The chart then reflects the five capital raisings which are the basis of Dr. Myers' model. Columns two through six reflect the amount of capital subsequently infused into Home Savings. Each capital raising is reflected for each year it is outstanding. Column seven provides a total for the amount of outstanding capital for each particular year. In some years, more than one capital raising remains outstanding. The last column gives the amount of supervisory goodwill replaced for each year.

This column reflects the remaining hole of supervisory goodwill which has not been replaced, but is disallowed after the redemption or repayment of all five of the capital raisings portrayed here. We will address this column *infra*. Further, we have not included the notes Dr. Myers' provided on his original exhibit which explain the source of his information.

**29.** Dr. Myers did not include within his damages model Home Savings' own subordinated debt issuance because it did not count towards all of Home Savings' capital requirements.

**30.** We have not included Dr. Myers' notes explaining his sources.

**31.** The original Exhibit E contains a ninth column titled "Second–Round Substitute Capital."

| Year | Supervisory Goodwill Disallowed [1] | Capital Infused by Ahmanson into Home After FIRREA | | | | | Total Capital Infused by Ahmanson post-FIRREA [7] | First-Round Substitute Capital [8] |
|---|---|---|---|---|---|---|---|---|
| | | Nov-89 Subordinated Debt [2] | Sept-91 Preferred Equity [3] | Feb-93 Preferred Equity [4] | Aug-93 Convertible Pref. Equity [5] | Aug-94 Subordinated Debt [6] | | |
| 1989 | 418 | 250,000 | | | | | 250,000 | 418 |
| 1990 | 11,537 | 250,000 | | | | | 250,000 | 11,537 |
| 1991 | 31,125 | 250,000 | 169,100 | | | | 419,100 | 31,125 |
| 1992 | 43,619 | 250,000 | 169,100 | | | | 419,100 | 43,619 |
| 1993 | 92,182 | 250,000 | 169,100 | 188,400 | 141,000 | | 748,500 | 92,182 |
| 1994 | 203,550 | 250,000 | 169,100 | 188,400 | 141,000 | 100,000 | 848,500 | 203,550 |
| 1995 | 333,193 | 250,000 | 169,100 | 188,400 | 141,000 | 100,000 | 848,500 | 333,193 |
| 1996 | 320,825 | 250,000 | 169,100 | 188,400 | 141,000 | 100,000 | 848,500 | 320,825 |
| 1997 | 308,457 | 250,000 | | 188,400 | 141,000 | 100,000 | 679,400 | 308,457 |
| 1998 | 296,090 | 250,000 | | 188,400 | 141,000 | 100,000 | 679,400 | 296,090 |
| 1999 | 283,722 | 250,000 | | | | 100,000 | 350,000 | 283,722 |
| 2000 | 271,354 | | | | | 100,000 | 100,000 | 100,000 |
| 2001 | 258,986 | | | | | 100,000 | 100,000 | 100,000 |
| 2002 | 246,618 | | | | | 100,000 | 100,000 | 100,000 |
| 2003 | 234,250 | | | | | 100,000 | 100,000 | 100,000 |
| 2004 | 221,883 | | | | | 100,000 | 100,000 | 100,000 |
| 2005 | 209,515 | | | | | | 0 | 0 |
| 2006 | 197,147 | | | | | | 0 | 0 |
| 2007 | 184,779 | | | | | | 0 | 0 |
| 2008 | 172,411 | | | | | | 0 | 0 |
| 2009 | 160,044 | | | | | | 0 | 0 |
| 2010 | 147,676 | | | | | | 0 | 0 |
| 2011 | 135,308 | | | | | | 0 | 0 |
| 2012 | 122,940 | | | | | | 0 | 0 |
| 2013 | 110,572 | | | | | | 0 | 0 |
| 2014 | 98,204 | | | | | | 0 | 0 |
| 2015 | 85,837 | | | | | | 0 | 0 |
| 2016 | 73,469 | | | | | | 0 | 0 |
| 2017 | 61,101 | | | | | | 0 | 0 |
| 2018 | 48,733 | | | | | | 0 | 0 |
| 2019 | 36,365 | | | | | | 0 | 0 |
| 2020 | 23,997 | | | | | | 0 | 0 |
| 2021 | 12,031 | | | | | | 0 | 0 |
| 2022 | 6,564 | | | | | | 0 | 0 |
| 2023 | 3,313 | | | | | | 0 | 0 |
| 2024 | 460 | | | | | | 0 | 0 |
| 2025 | 3 | | | | | | 0 | 0 |

Home Savings did not keep track of how it utilized capital, once raised. Therefore, there was no means by which Dr. Myers could determine how much of any one capital raising was used to replace supervisory goodwill. Instead, capital was fungible. He therefore assumed that a portion of each capital raising went towards replacing supervisory goodwill. He explained that the cost of capital was appropriately calculated by a weighted average cost of capital for any given year. That is, Dr. Myers assumed that a portion of each capital raising outstanding for a particular year went to replace supervisory goodwill.

For example, in 1991, $31.1 million in supervisory goodwill was disallowed. Ahmanson infused $250 million from the November 1989 issuance of subordinated debt and $169 million from the September 1991 preferred equity into Home Savings. Dr. Myers assumed that the $31.1 million lost supervisory goodwill would be replaced by each capital raising in relation to its size. The November 1989 subordinate debt issue of $250 million was 59.6% of the $419 million total raised in that year. The September 1991 $169 million in preferred equity was 40.4% of the total amount raised. Based on these percentages, Dr. Myers assumed that $18.55 million from the November 1989 subordinated debt and $12.55 million from the September 1991 preferred equity went to replace the $31.1 million gap in regulatory capital. Dr. Myers used this method, a weighted average, for determining the cost of capital for each year of the damages period.

Because the interest paid on subordinated debt issues is tax-deductible, Dr. Myers adjusted the cost of capital by its tax benefit. He thus reduced the interest cost associated with the subordinated debt issues. Dr. Myers determined the cost for the five capital raisings, after adjustments, as follows. The after-tax cost of the 1989 subordinated debt issue fluctuated between 5.728% in 1989 and 5.846% in 1991 due to the tax effects. The cost of the 1991 preferred stock was 9.6%. The cost of the 1993 preferred stock was 8.4%.

Because there is no difference between the before and after tax cost for preferred stock, Dr. Myers made no adjustment in the costs for the two preferred stock raisings. Furthermore, for the convertible preferred stock issued in August 1993, Dr. Myers ignored any benefit to the stockholders of the conversion.[32] That is, he utilized the initial issue cost, as opposed to the actual cost to Ahmanson as a result of the voluntary conversions by all shareholders. Dr. Myers explained that he ignored the conversions because the conversions drove costs up for Ahmanson. He therefore utilized the initial issue rate of 8.241%, which was more conservative for damages purposes. The after-tax cost for the 1994 subordinated debt was initially 4.564% in August 1994, fluctuating as high as 4.812% in 2000 due to changes in tax effects. The results are depicted in Exhibit F of Dr. Myers' report.

These calculations thus produce a figure for the amount expended on replacement capital attributable to the loss of supervisory goodwill. Dr. Myers' calculation of cost, in short, is basically undisputed. Defendant has not seriously contended that these costs are inaccurate or that, if plaintiffs wanted to raise capital, that doing so through subordinated debt or preferred stock at these rates was not a legitimate means. The court finds that Dr. Myers' analysis accurately reflects the gross cost to plaintiffs to replace supervisory goodwill through market capital.

Supervisory goodwill could not be purchased in the market place. In fact, plaintiffs could not generate new capital by "buying" anything; the very process would have eliminated capital. As Dr. Myers explained, supervisory goodwill had the following characteristics: it was available to plaintiffs in a fixed amount, it was guaranteed by the government,[33] it had to be amortized over a specific period of time, and it could be used as regulatory capital. If an asset could have been substituted to replace supervisory good-

will, the asset most comparable in character is, according to Dr. Myers, another safe asset, namely, the intermediate term Treasury bond. As he stated in his report:

> [h]ad the Government performed its obligations, Home would have had a predetermined amount of [s]upervisory [g]oodwill on its balance sheet. Supervisory [g]oodwill had no risk. Investing the proceeds of the substitute capital in safe assets gives the closest replication of the risks of Home Savings and Ahmanson absent the breach.

Therefore, if Home Savings were to convert cash into a comparable asset which would most closely mimic supervisory goodwill, it would have been required to pay that safe rate. Part of the costs incurred, therefore, represents what plaintiffs paid the income-producing character of the closest analog to supervisory goodwill, what Dr. Myers refers to as the "safe asset."

Plaintiffs could not, in fact, make this substitution, however. Instead, the best means for plaintiffs to generate new capital was through the more expensive method of raising preferred stock and subordinated debt. Plaintiffs are, in effect, claiming the premium between what they actually had to pay to generate capital and this safe rate of return. Dr. Myers concluded that offsetting plaintiffs' actual replacement costs with the hypothetical safe rate was the appropriate adjustment to account for the benefits of gaining both regulatory capital and tangible capital when Home Savings replaced supervisory goodwill.

Dr. Myers calculated this safe rate for each year the capital raisings were outstanding. It was then adjusted by the after-tax benefits which would have been available to plaintiffs if they had raised capital in the form of subordinated debt at that rate. Utilizing the intermediate-term Treasury bond, according to Dr. Myers, produced a very

---

**32.** The August 1993 convertible stock carried an option to convert, at the shareholder's option, into common stock of Ahmanson. Dr. Myers explained that convertible stock carries a relatively lower cost to Ahmanson than common stock. The common stock is relatively more expensive after the conversion. The stockholders

of Ahmanson, in the end, decided to convert all of the convertible stock into common stock. Being conservative, Dr. Myers ignored this higher cost to plaintiffs.

**33.** FIRREA notwithstanding.

conservative rate.[34] He then subtracted the rate of return earned on safe assets for that year. The difference was the spread for that particular year.

For instance, in 1991, the after-tax cost of the November 1989 subordinated debt was 5.846%, the after-tax safe rate of return was 4.612%, and the difference being 1.234%. The adjusted cost of the November 1980 subordinated debt was multiplied by the proportion of total capital the subordinated debt constituted, $250 million out of $419.1 million total, or 59.6%. Similarly, the after-tax safe rate of 4.612% was subtracted from the cost of the September 1991 preferred stock of 9.6% for an after-tax spread of 5.497%. The adjusted cost of the September 1991 preferred stock is multiplied by its proportion of total capital outstanding for that year, or 40.4%, and added to the November 1980 weighted average cost. The final weighted average cost of capital for 1991 is 2.954%. Dr. Myers then multiplied this cost by the amount of disallowed supervisory goodwill, $31.1 million, for the total cost of capital, $.92 million. Dr. Myers did this calculation for each year and added transaction costs of $4,309,000,[35] for a total cost of substitute capital of $61,524,000.

2. Damage from Replacement of Supervisory Goodwill by Retained Earnings

The five capital raisings addressed *supra* did not make plaintiffs whole. The last round of capital raised, the August 1994 subordinated debt, will be paid off in 2004. Even after that subordinated debt is paid off, Home Savings will not have completely replaced the disallowed supervisory goodwill. For instance, in 2000, supervisory goodwill in the amount of $271 million was disallowed. However, the August 1994 subordinated debt, the only remaining capital raising, supplied $100 million in capital.[36] This left $171 million in disallowed supervisory goodwill still not replaced. Furthermore, Home Savings was entitled to claim supervisory goodwill as regulatory capital until 2025, well past the 2004 pay-off date. Thus, while the last capital raising will be paid off in 2004, Home Savings will continue to have to adjust to the supervisory goodwill until 2025. Additional capital will be necessary to fill the gap.

Dr. Myers developed a chart depicting the remaining deficit. It is shown in modified [37] form below. The total amount of capital infused by Ahmanson into Home Savings, with dollar amounts in thousands, is depicted by column two. The amount of supervisory goodwill replaced by the first round of substitute capital raisings is shown by column three. The net amount of un-replaced supervisory goodwill replaced by retained earnings is depicted by column four.

34. Although Dr. Myers did not use it, he explained that another possible measure of the value of tangible capital would be the rate Home Savings paid on its deposits. Deposits render a reasonably certain rate of return, and are backed by the government up to $100,000. However, determining exactly what Home Savings' rate would have been during this time would be difficult, because the depository rate includes other sources of funds, such as FHLBB advances. Further, there are hidden costs associated with depository rates, such as the cost of servicing the depository accounts. The straight depository rate, in short, would have produced a lower rate of return than the intermediate-term Treasury bond.

35. Dr. Myers calculated the transaction costs by prorating the actual transaction costs for the entire $850 million capital raised to the amount which would have been necessary to raise the $333 million in supervisory goodwill which would be replaced.

36. This is distinct from earlier years, when the capital raisings had been sufficient to fill the gap left post-FIRREA. For instance, in 1996, capital raisings provided $848.5 million to Home Savings. At that same time, $320.8 million in supervisory goodwill had been disallowed. Thus, more capital had been raised than necessary to simply replace supervisory goodwill, as discussed *supra*.

37. For ease of reading, the court has removed columns two through six, which depict the five initial capital raisings. Dr. Myers' original exhibit E labeled column four "Second Round Substitute Capital." Its heading has been changed in order to eliminate any possible confusion between the five specific capital raisings which Home Savings actually undertook, which are named the "First Round Substitute Capital," and the remaining unreplaced supervisory goodwill replaced with retained earnings. Additionally, the notes explaining where Dr. Myers obtained the supporting data for this chart are not included.

| Year | Supervisory Goodwill Disallowed [1] | Total Capital Infused by Ahmanson After FIRREA [2] | First–Round Supervisory Capital [3] | Supervisory Goodwill Replaced with Retained Earnings [4] |
|------|------|------|------|------|
| 1989 | 418 | 250,000 | 418 | 0 |
| 1990 | 11,537 | 250,000 | 11,537 | 0 |
| 1991 | 31,125 | 419,100 | 31,125 | 0 |
| 1992 | 43,619 | 419,100 | 43,619 | 0 |
| 1993 | 92,182 | 748,500 | 92,182 | 0 |
| 1994 | 203,550 | 848,500 | 203,550 | 0 |
| 1995 | 333,193 | 848,500 | 333,193 | 0 |
| 1996 | 320,825 | 848,500 | 320,825 | 0 |
| 1997 | 308,457 | 679,400 | 308,457 | 0 |
| 1998 | 296,090 | 679,400 | 296,090 | 0 |
| 1999 | 283,722 | 350,000 | 283,722 | 0 |
| 2000 | 271,354 | 100,000 | 100,000 | 171,354 |
| 2001 | 258,986 | 100,000 | 100,000 | 158,986 |
| 2002 | 246,618 | 100,000 | 100,000 | 146,618 |
| 2003 | 234,250 | 100,000 | 100,000 | 134,250 |
| 2004 | 221,883 | 100,000 | 100,000 | 121,883 |
| 2005 | 209,515 | 0 | 0 | 209,515 |
| 2006 | 197,147 | 0 | 0 | 197,147 |
| 2007 | 184,779 | 0 | 0 | 184,779 |
| 2008 | 172,411 | 0 | 0 | 172,411 |
| 2009 | 160,044 | 0 | 0 | 160,044 |
| 2010 | 147,676 | 0 | 0 | 147,676 |
| 2011 | 135,308 | 0 | 0 | 135,308 |
| 2012 | 122,940 | 0 | 0 | 122,940 |
| 2013 | 110,572 | 0 | 0 | 110,572 |
| 2014 | 98,204 | 0 | 0 | 98,204 |
| 2015 | 85,837 | 0 | 0 | 85,837 |
| 2016 | 73,469 | 0 | 0 | 73,469 |
| 2017 | 61,101 | 0 | 0 | 61,101 |
| 2018 | 48,733 | 0 | 0 | 48,733 |
| 2019 | 36,365 | 0 | 0 | 36,365 |
| 2020 | 23,997 | 0 | 0 | 23,997 |
| 2021 | 12,031 | 0 | 0 | 12,031 |
| 2022 | 6,564 | 0 | 0 | 3,534 |
| 2023 | 3,313 | 0 | 0 | 3,313 |
| 2024 | 460 | 0 | 0 | 460 |
| 2025 | 3 | 0 | 0 | 3 |

As the chart shows, beginning in the year 2000, the capital previously raised by Home Savings no longer replaced all the supervisory goodwill disallowed by FIRREA. However, as Mr. Rinehart explained, Home Savings was still left with a gap in its capital level in order to meet its target capital ratio. This capital need, however, is largely in the future. Thus, Home Savings has not yet raised capital to fill this gap. Rather than create a hypothetical future capital raising in the market place, Dr. Myers' model assumes that "remaining" supervisory goodwill was, or will be, replaced by retained earnings.

Replacing supervisory goodwill with retained earnings, however, also involves costs. As Dr. Myers explained, whoever supplies equity, whether from subordinated debt or stock, demands a return. When a thrift retains earnings, it is essentially requesting the stockholders to put their money back into the thrift. Existing stockholders, therefore, demand the same rate of return as those who purchase new stock.

As a proxy for what existing shareholders would demand, Dr. Myers utilized the lowest cost source of capital from Home Savings'

earlier capital raisings, the subordinated debt issued in August 1994, maturing in 2004. The after-tax cost to the company for this subordinated debt was 4.68%. The contemporaneous after-tax Treasury rate, or safe rate, was 3.94%. As with the actual capital raisings, he adjusted the cost of retained earnings by the safe rate. The after-tax spread is .74%.[38] He multiplied the after-tax spread by the dollar amount raised. That total was discounted back at the subordinated debt rate.[39] This is depicted by Exhibit H to his expert report.[40]

| Year | Retained Earnings Substitute Capital [1] | After–Tax Spread on Retained Earnings Substitute Capital [2] | Dollar Spread on Retained Earning Substitute Capital [3] | Present Value Factor [4] | Present Value of Dollar Spread [5] |
|---|---|---|---|---|---|
| 1989 | - | - | - | 1.00 | - |
| 1990 | - | - | - | 1.00 | - |
| 1991 | - | - | - | 1.00 | - |
| 1992 | - | - | - | 1.00 | - |
| 1993 | - | - | - | 1.00 | - |
| 1994 | - | - | - | 1.00 | - |
| 1995 | - | - | - | 1.00 | - |
| 1996 | - | - | - | 1.00 | - |
| 1997 | - | - | - | 1.00 | - |
| 1998 | - | - | - | 1.00 | - |
| 1999 | - | - | - | 1.00 | - |
| 2000 | 171,354 | 0.74% | 1,267 | 1.00 | 1,267 |
| 2001 | 158,986 | 0.73% | 1,162 | 1.00 | 162 |
| 2002 | 146,618 | 0.73% | 1,071 | 0.98 | 1,053 |
| 2003 | 134,250 | 0.73% | 981 | 0.95 | 932 |
| 2004 | 121,883 | 0.73% | 890 | 0.92 | 818 |
| 2005 | 209,515 | 0.73% | 1,462 | 0.89 | 1,299 |
| 2006 | 197,147 | 0.73% | 1,376 | 0.86 | 1,182 |
| 2007 | 184,779 | 0.70% | 1,289 | 0.83 | 1,071 |
| 2008 | 172,411 | 0.70% | 1,203 | 0.80 | 96 |
| 2009 | 160,044 | 0.70% | 1,117 | 0.78 | 867 |
| 2010 | 147,676 | 0.70% | 1,030 | 0.75 | 74 |
| 2011 | 135,308 | 0.70% | 944 | 0.73 | 685 |
| 2012 | 122,940 | 0.70% | 858 | 0.70 | 602 |
| 2013 | 110,572 | 0.70% | 771 | 0.68 | 523 |
| 2014 | 98,204 | 0.70% | 685 | 0.60 | 450 |
| 2015 | 85,837 | 0.70% | 599 | 0.63 | 380 |
| 2016 | 73,469 | 0.70% | 516 | 0.61 | 314 |
| 2017 | 61,101 | 0.70% | 426 | 0.59 | 253 |
| 2018 | 48,733 | 0.70% | 340 | 0.57 | 195 |
| 2019 | 36,365 | 0.70% | 254 | 0.55 | 141 |
| 2020 | 23,997 | 0.70% | 167 | 0.54 | 90 |
| 2021 | 12,031 | 0.70% | 84 | 0.52 | 43 |
| 2022 | 3,534 | 0.70% | 46 | 0.50 | 23 |
| 2023 | 3,313 | 0.70% | 23 | 0.48 | 11 |

38. Dr. Myers adjusted this after-tax spread for the years going forward from 2001 to 2004 at .73 due to a change in the marginal tax rates. The average spread on this additional capital from 2005 to 2025 is .70 percent. The rate drops in 2005 because the last capital raising is retired in 2005. The .70 percent spread is therefore based on the capital from retained earnings alone.

39. He testified that this accounted for the risk to investors that they would not be paid as well as the time value of money.

40. Dollars are depicted in thousands. Additionally, the court has adjusted the column headings to reflect "retained earnings" as opposed to the more confusing heading "second-round" which Dr. Myers employed in his report.

| 2024 | 460 | 0.70% | 3 | 0.47 | 2 |
| 2025 | 3 | 0.70% | 0 | 0.45 | 0 |

**Total dollar spread on retained earning substitute capital**      **15,103**

The present cost of using retained earnings as substitute capital in the future is $15,103,000. Added to the actual net cost of raising capital in the past, $61,524,000, the total before-tax cost to plaintiffs is $76,627,000.

In addition to this amount, plaintiffs claim $4.3 million in costs directly but proportionately associated with issuance of new capital. Defendant has not contested this figure. Accordingly, plaintiffs pre-tax adjusted claim is for $80,936,000.

### C. Defendant's Rejoinder to Plaintiffs' Model

Fundamentally, Dr. Leftwich makes two criticisms of plaintiffs' model. First, Dr. Leftwich attacks Dr. Myers' basic factual assumption-namely, that Home Savings actually choose to replace supervisory goodwill. Dr. Leftwich asserts that the evidence, as he interprets it, shows that Home Savings did not replace supervisory goodwill. Second, Dr. Leftwich asserts that Dr. Myers' damages model is flawed, based on economic and financial principles. Dr. Leftwich provided the court with no independent evidence with respect to these matters. Instead, he and Dr. Myers analyzed the same information, but came to different conclusions.

### 1. Did Home Savings Need to Replace Supervisory Goodwill?

Dr. Leftwich asserts that Home Savings had no need to, and in fact, did not, replace supervisory goodwill. His conclusion is based largely on his analysis of the amount of regulatory capital Home Savings retained in excess of minimum standards, which he referred to as the capital cushion. Because Home Savings' capital cushion exceeded the amount of supervisory goodwill to which it was entitled in 1988, he concluded that Home Savings did not need supervisory goodwill to support its assets at the time of FIRREA's passage. Instead, it could have supported its assets with its existing regulatory capital. Supervisory goodwill, therefore, was not valuable to Home Savings and did not need to be replaced.[41]

Dr. Leftwich provided an illustration. His hypothetical thrift has $100 in regulatory capital, consisting of $30 in supervisory goodwill and $70 in tangible capital. His hypothetical thrift has $1000 in assets. The capital ratio is therefore ten percent of total assets. If supervisory goodwill subsequently could not count towards regulatory minimums the thrift still has $70 in regulatory capital, or a regulatory capital ratio of seven percent. If the capital requirement is four percent, the thrift, according to Dr. Leftwich, is not harmed by the removal of supervisory goodwill. Its cushion merely shrinks.

He asserts this is the very scenario in which Home Savings found itself. At the time FIRREA was adopted, Home Savings had $605 million in regulatory capital in excess of FIRREA's three percent capital requirement. It held only $397 million in supervisory goodwill at the time. Dr. Leftwich thus concludes that Home Savings did not, in fact, need to raise capital. Instead, it could have absorbed the nearly $400 million loss of supervisory goodwill by reducing excess capital. He acknowledges that Home Savings would have been forced to operate with a substantially lower capital cushion in order to do so, however.

Alternatively, Dr. Leftwich argues that not only *could* Home Savings have absorbed the loss of supervisory goodwill by operating closer to regulatory minimums, it did so. He explained that the mere fact that Ahmanson

---

41. Dr. Leftwich also argued that because subordinated debt was significantly cheaper than preferred stock, on an after-tax basis, if Home Savings was truly interested in replacing supervisory goodwill it would have simply replaced with subordinated debt. However, as we discuss *infra*, Dr. Leftwich acknowledged that a thrift would have business reasons for raising a mix of preferred stock and subordinated debt, including maintaining a favorable debt/equity ratio to attract investors.

infused $850 million into Home Savings does not prove that supervisory goodwill was replaced. Instead, he analyzed the amount of regulatory capital which Home Savings maintained in excess of regulatory minimums and determined that because the relative capital cushion did not remain static before or after FIRREA, Home Savings apparently did not replace supervisory goodwill. His analysis lead him to conclude that the capital cushion shrank after the passage of FIRREA. Home Saving simply operated closer to regulatory minimums.

Dr. Leftwich expressed Home Savings' capital cushion as a percentage of regulatory capital maintained in excess of regulatory requirements. For instance, in 1988, the last year prior to FIRREA, Home Savings maintained $1.896 billion in regulatory capital. Under the pre-FIRREA regulatory capital requirements, Home Savings was required to maintain $959 million in regulatory capital. Thus, Home Savings maintained $937 million, or 98% in excess regulatory capital.

Dr. Leftwich asserted that Home Savings itself viewed its capital cushion in this manner, as a percentage of regulatory minimums. For support, he pointed to Home Savings' 1986 10–K, which explained that Home Savings'

> [r]egulatory net worth grew by more than $500 million, or 55%. At December 31, 1986, Home's regulatory net worth was $1,574,565,000—more than twice regulatory minimums.

HOME SAVINGS OF AMERICA, 1986 ANNUAL REPORT 6.

Furthermore, Dr. Leftwich explained that his manner of expressing regulatory minimums was appropriate because capital requirements "were changed throughout the [damages] time period. For example, pre-FIRREA it was a percentage of liabilities, in the post-FDICIA period, it was a percentage of assets, particularly adjusted tangible assets." Trial Tr. at 1865. He felt that, by expressing the capital cushion in terms of a percentage of the excess regulatory capital beyond regulatory requirements, the problem of having changes in the capital cushion attributable to the changes in regulatory requirements was minimized.[42] Dr. Leftwich testified that, due to these changes, "if one were to just take [the capital cushion] as a percentage of total assets, that would be ignoring the fact that the total asset—that the capital requirements were not based on total assets, consistently throughout that time period." Trial Tr. at 1866.

Dr. Leftwich provided the court with an exhibit displaying Home Savings' capital ratios both before and after FIRREA. The chart is displayed below, in slightly altered form:

---

42. It is not clear to the court that Dr. Leftwich's analysis actually achieves his stated goal of calculating the capital cushion in a manner such that the fluctuations in the capital cushion cannot be attributed to regulatory changes. The opposite would seem to be true. For instance, if a thrift were to have $1 billion in assets, with a 6% capitalization requirement, and maintained $80 million in regulatory capital, it would have $20 million in excess capital. Under Dr. Leftwich's analysis, the capital cushion for that thrift would be 33.33%. If the capital requirements were to change to 4%, and the thrift were to maintain the same $20 million in excess regulatory capital, the thrifts' capital cushion according to Dr. Leftwich, would be 50%. Although the amount of excess regulatory capital did not change, the thrift's capital cushion would have drastically increased, simply because of a change in regulatory requirements.

Similarly, if the example were changed only slightly, so that the $1 billion thrift were to maintain $100 million in capital with a capitalization requirement of 5%, it would have excess regulatory capital of $50 million. The capital cushion would be 100%. But if the capital requirement were raised from 5% to 6% while the actual capitalization remained at $100 million, it would have only $40 million in excess capital, and a capital cushion of 66.66%. Thus, a 20% increase in the capital requirement, from 5% to 6%, would result in a 33.33% drop in the capital cushion.

Dr. Leftwich's View of Home Savings Excess Regulatory Capital

He testified that Home Savings' capital cushion fell from 98% above the regulatory minimums prior to FIRREA, to only 46% above the regulatory minimums after FIRREA's passage in 1989. Using this same ratio for 1990, Home Savings capital cushion fell to 39% above regulatory minimums.[43]

Based on Dr. Leftwich's approach, in order to show that Home Savings actually replaced supervisory goodwill, Home Savings would have had to maintain the same capital cushion before and after FIRREA.[44] Dr. Leftwich testified that Home Savings' capital cushion dropped by $2.325 billion after FIRREA, while it only raised $850 million in tangible capital during that time. Specifically, in order to show that Home Savings replaced $333 million in capital, it would have had to replace the entire $2.325 billion drop in its capital cushion.

Plaintiffs acknowledge that Home Savings could have absorbed the initial loss of supervisory goodwill and still been in compliance with new regulatory requirements. Thereafter, however, it would not have been in compliance. They point out that Dr. Leftwich's analysis conflicts directly with the testimony of numerous fact witnesses. Mr. Sanchez testified that Home Savings did not, in fact, have sufficient capital to meet all of the demands on that capital, including regulatory requirements. Mr. Deihl and Mr. Rinehart testified that Home Savings was required to, and did, in fact, raise additional capital purely as a result of FIRREA. They explained, and we believe them, that Home Savings had determined the bank's desired capitalization levels independent of the loss of supervisory goodwill, and that the loss of supervisory goodwill therefore prompted a dollar for dollar substitution of capital to the extent of the deficit. The breach caused Home Savings to raise more capital than it otherwise would have.

Dr. Myers demonstrated that, absent new capital, Home Savings could not have met the new FDICIA standards, as passed in December 1991. Beginning in December 1992, Home Savings would have been below FDICIA's adequately capitalized standard of 4%, far from FDICIA's much more desirable well-capitalized standard of 5%. Absent FIRREA, supervisory goodwill could have counted as regulatory capital towards the capital standards even under FDICIA.

43. Home Savings' capital cushion, under Dr. Leftwich's analysis rose to 70% in 1991, and rose again to 92% in 1992. Its capital cushion then fluctuated between 83% in 1994 and 97% in 1995.

44. Dr. Leftwich did conduct a comparison of Home Savings' core capital ratio with other large thrifts. However, the comparison was not directed at what Home Savings' capital cushion would have been had FIRREA not been passed. Instead, it was an examination of Home Savings actual core capital ratio in relation to other thrifts' core capital ratio.

Dr. Myers does not, moreover, accept Dr. Leftwich's method of calculating Home Savings' capital cushion or his conclusion that the data demonstrates that Home Savings did not replace supervisory goodwill. He made a similar calculation but measured the excess capital as a percentage of total assets. He argued that this is appropriate because the ultimate purpose of the capital cushion is to guard against a fall in the value of tangible assets.

> Think of what the cushion is supposed to cover. The cushion is supposed to cover a fall in assets, either due to operating losses or some kind of write-down or write-off of assets. When you see a capital cushion, let's say, 2.2 percent of assets, that means that the thrift can absorb a 2.2 percent fall

in asset value before it hits the minimum. So it's natural to tie the cushion to asset value, because what you're worried about is a fall in asset value, either due to some kind of write-down of assets or operating losses.

Trial Tr. at 212.

Dr. Myers provided the court with Plaintiffs' Exhibit 614, which displayed his approach to assessing the "cushion."[45] He began with the minimum regulatory requirements. He then determined, by examining Home Savings' TFRs, Home Savings' total available regulatory capital. The difference between the two is excess capital. He then expresses this dollar "cushion" as a percentage of Home Savings' total assets.

### Analysis of Home Savings' Capital Cushion

| | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | | | | Avg. |
|---|---|---|---|---|---|---|---|---|---|---|
| Reg. Capital Required | 453,415 | 551,417 | 614,365 | 728,000 | 836,000 | 959,000 | | | | |
| Reg. Capital | 777,095 | 820,047 | 1,013,436 | 1,606,000 | 1,790,000 | 1,896,000 | | | | |
| Excess Capital | 323,680 | 268,630 | 399,071 | 878,000 | 954,000 | 937,000 | | | | |
| Total Assets | 19,748,414 | 23,891,907 | 26,746,193 | 27,789,661 | 30,533,471 | 34,778,199 | | | | |
| Excess Capital (% of Assets) | 1.64 | 1.12 | 1.49 | 3.16 | 3.12 | 2.69 | | | | 2.21 |

| | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Reg. Capital Required | 1,318,000 | 1,514,000 | 1,383,000 | 1,412,000 | 1,497,000 | 1,590,000 | 1,501,000 | 1,483,000 | 1,383,000 | |
| Reg. Capital | 1,923,000 | 2,104,000 | 2,355,000 | 2,716,000 | 2,852,000 | 2,915,000 | 2,959,000 | 2,746,000 | 2,706,000 | |
| Excess Capital | 605,000 | 590,000 | 972,000 | 1,304,000 | 1,355,000 | 1,325,000 | 1,458,000 | 1,263,000 | 1,323,000 | |
| Total Assets | 39,987,313 | 43,903,325 | 40,020,242 | 41,183,509 | 50,510,707 | 53,606,589 | 51,175,188 | 49,636,887 | 346,127,543 | |
| Excess Capital (% of Assets) | 1.51 | 1.34 | 2.43 | 3.17 | 2.68 | 2.47 | 2.85 | 2.54 | 2.87 | 2.43 |
| Adjusted Tangible Assets | 43,904,110 | 50,468,287 | 46,109,389 | 47,063,713 | 49,899,609 | 53,009,049 | 5,049,587 | 49,419,505 | 46,104,549 | |
| Excess Capital (% of Adjusted Tangible Assets) | 1.38 | 1.17 | 2.11 | 2.77 | 2.72 | 2.5 | 2.91 | 2.56 | 2.87 | 2.33 |

The upper portion of the chart shows Home Savings' pre-FIRREA capital cushion for the years 1983–1988. The lower half reflects Home Savings' post-FIRREA capital cushion for the years 1989–1996. The average pre-FIRREA cushion was 2.21%. Post–FIRREA that percentage grew to 2.33 % of adjusted tangible assets.[46] Thus, when examining the capital cushion based on Dr. Myers' measurement, the capital cushion ac-

45. The chart as shown does not contain Dr. Myers' footnote displaying his sources. Dr. Myers gained his raw numbers from his examination of Home Savings' TFRs and 10–Ks. Additionally, for ease of reading regulatory has been abbreviated as "reg." Dollars are shown in thousands.

46. Dr. Myers explained that he made several adjustments to Home Savings' total assets as found on its 10–K and TFR statements before he determined the appropriate capital cushion. These adjustments were necessary according to Dr. Myers because after FIRREA, certain assets were consolidated into Home Savings' assets which had not been included prior to FIRREA. The adjustments, according to Dr. Myers, allowed for a true comparison in capital cushions. Dr. Leftwich did not address these adjustments.

tually increased slightly after the passage of FIRREA.

Given the fact that the two experts used the same raw data it is mildly puzzling that they are able to produce support for conflicting conclusions. The explanation, of course, lies in the difference in how they construct their ratios. Defendant's ratio will always be more sensitive to changes in capitalization because it measures the excess as a function of an inherently smaller denominator-the total amount of required capital.

To the extent these figures matter, we believe Dr. Myers' approach to the capital cushion is more in line with the evidence about how Home Savings actually calculated its cushion at the time. Mr. Deihl recalled that the capital cushion, as Home Savings' calculated it, was "usually in the neighborhood of 2, 2½ percent. Sometimes it dropped, sometimes it went up. But that's approximately right." Trial Tr. at 851. He testified that the bank focused on how well it was protected against a loss in asset values. Mr. Rinehart explained that Home Savings viewed the capital cushion in terms of how many more regulatory dollars would be required in order to fund a particular level of total assets "for every dollar of assets you had, you had to have a nickel of capital to cover it. So if the company had, say $100 million of assets and it grew from $100 million to $101[,] the additional $1 million would require another [$]50,000." Trial Tr. at 657.

Mr. Deihl and Mr. Rinehart both explained that FIRREA did not change the business reasons for maintaining a particular capital cushion at any given time. Instead, Home Savings maintained the capital cushion that its management thought necessary, for reasons unrelated to the breach. Home Savings had relied on supervisory goodwill to meet regulatory requirements and maintain its target capital level. When supervisory goodwill no longer counted towards regulatory minimums, Home Savings needed to raise more capital than it otherwise would have in order to maintain this level.

We are inclined to think, however, that the disagreement does not matter. Dr. Leftwich's analysis is ultimately irrelevant. Even if the capital cushion shrank, Home Savings would not have met the capital requirements of FIRREA absent new capital. It had to raise capital to remain compliant, and it is undisputable that, irrespective of the amount of cushion, the loss of supervisory goodwill meant that more capital had to be raised.

Thus, even if it is true that Home Savings' regulatory capital in 1988 was greater than the amount minimally necessary to maintain its mandatory core capital, and even if it is true that the cushion shrank, this does not prove that Home Savings was not injured by the loss of supervisory goodwill. Home Savings is entitled to rely on the target capital levels it set for itself during the post-FIRREA period. The total amount of capital that it needed to appear on its books, whatever the source, was the result of business considerations. Mr. Rinehart explained that Home Savings maintained the same approach to determining its capitalization, even after FIRREA. The only variable affected by the loss of supervisory goodwill was the amount of capital that had to be to raised. Home Savings was entitled to manage its capital conservatively, maintaining a cushion it felt adequate to protect against the vagaries of the market. Even if accepted, Dr. Leftwich's suggestion of a decrease in Home Savings capital cushion is therefore no evidence that Home Savings did not replace supervisory goodwill.

2. Defendant's Other Arguments Regarding Whether Home Savings Replaced Supervisory Goodwill

What we have said heretofore also answers other arguments made by Dr. Leftwich. He identified, for example, four reasons Home Savings had for raising capital-reasons he asserts were unrelated to the loss of supervisory goodwill: Home Savings' asset growth required approximately $500 million in additional regulatory capital to support new assets; Home Savings' cumulative loan losses between 1989 and 1994 depleted both tangible and regulatory capital, with an after-tax cost of $900 million in capital; FIRREA introduced a new risk-based capital requirement, causing Home Savings to raise an additional one billion dollars in capital by 1991;

the new capital requirements imposed by FDICIA required Home Savings to raise nearly a billion dollars in order to reach FDICIA's 5% well-capitalized standard.

Undisputably, there were reasons other than the loss of supervisory goodwill that Home Savings raised capital following FIR-REA. Ahmanson and Home Savings raised far more capital than the amount claimed here as substitution for lost supervisory goodwill. Mr. Deihl and Mr. Rinehart made it clear that a number of factors, including those identified by Dr. Leftwich, drove Home Savings' total target for capitalization. As Mr. Deihl and Mr. Rinehart explained, however, once a target capital level was fixed, for whatever business or regulatory reason, the issue for management was to fill the gap between the capital on hand and these target levels. Disallowance of supervisory goodwill, as Mr. Rinehart testified, simply meant that Home Savings had to raise more capital than it otherwise would.

### 3. Does Plaintiffs' Model Account for the Benefits of Tangible Capital?

Dr. Leftwich challenges Dr. Myers' accounting for the benefits of supervisory goodwill. Dr. Leftwich argued that Dr. Myers' model assumes that Home Savings would have placed the tangible capital raised to replace supervisory goodwill in "low-cost" deposits instead of investing those dollars in profitable enterprises. Dr. Leftwich understands Dr. Myer's analysis to require that Home Savings actually invested the proceeds of raising capital into assets at the safe rate. Such an assertion, according to Dr. Leftwich, is contrary to logic, as well as Home Savings' actual practices. He asserts that Home Sav-

ings would have invested the dollars in a profitable enterprise.

For instance, according to Dr. Leftwich, Home Savings could have invested in relatively safe mortgage-backed securities to make a return high enough to offset any cost of raising capital. Dr. Leftwich testified that the mortgage-backed securities market is thriving and Home Savings could have invested all of the capital it raised. He did not attempt to quantify how much the bank would have made from this asserted opportunity.

In effect, defendant seeks to nullify the entire damage claim by asserting that capital is only raised if it is assumed to earn a return in excess of its cost. In other words, capital in fact has no costs other than transactional costs; it is always a wash. This is, in some respects, a reprise of his NPV zero theory, which we reject. We believe, however, that Dr. Leftwich is correct in part; plaintiffs must account somehow for the difference in character between what was taken away and what was substituted.

Plaintiffs have sought expectancy damages in the form of the cost of cover.[47] Cost of cover is formalized in the Uniform Commercial Code ("UCC"): "If a seller breaches a contract for the sale of goods, a buyer may 'cover,' which is to obtain substitute goods from another seller." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. 223, 230 (2003) (citing U.C.C. § 2–712 (1998); E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.11 (2d ed.1998)).[48] Damages are generally calculated as "the difference between the cost of cover and the contract price, together with incidental or consequential damages, but

---

47. The most basic principle of contract remedies is that damages should put the plaintiffs "in as good a position pecuniarily as [they] would have been in if the contract had been completely performed." *J.D. Hedin Constr. Co. v. United States*, 197 Ct.Cl. 782, 803, 456 F.2d 1315 (1972) (citing *G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 11, 312 F.2d 418, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963)). Where plaintiffs seek expectancy damages, the court awards damage to the non-breaching party in the amount of the benefits it expected to receive from the contract, absent breach. *See Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1380 (2001). Expectation damages are

generally measured by the "loss in the value to [the injured party] of the other party's performance caused by its failure or deficiency, plus ... any other loss, including incidental or consequential loss, caused by the breach ...." *Bank of Tex. F.S.B. v. United States*, 50 Fed.Cl. 645, 654 (2001) (citing Restatement (Second) of Contracts § 347 (1981)).

48. Although the UCC does not govern this contract, we may rely on its principles for guidance. *Id.* (citing *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed.Cir. 2001)).

less expenses saved as a result of [defendant's] breach." RICHARD A. LORD, WILLISTON ON CONTRACTS § 40:34 (4th ed.2000).

Typically, replacement goods are the same as those promised under the contract. Plaintiffs did not have the option here, however, of replacing lost supervisory goodwill with an identical commodity. It could not simply go into the marketplace and buy supervisory goodwill. The only means available to Home Savings for replacement was tangible capital, raised in the market, or through the retention of earnings-the most business-efficient ways to produce the same net effect with respect to meeting regulatory requirements. A plaintiff may nevertheless claim the cost of cover, even where the replacement goods are "not identical with those involved but commercially usable as reasonable substitutes under the circumstances." FARNSWORTH ON CONTRACTS § 12.11 (2d ed.2001) (citing UCC 2–712 cmt. 2; Anderson, *The Cover Remedy*, 6 J.L. & COM. 155 (1986)). The fact that the substitute is either of "superior or inferior quality does not of itself preclude its being cover; any measurable difference in quality can be compensated for by a money allowance." *Id.*

Plaintiffs acknowledge that tangible capital, whether raised within the corporation or from the outside, is not equivalent in all respects to supervisory goodwill. Tangible capital, like supervisory goodwill, may be used to meet regulatory capital requirements, but unlike supervisory goodwill, it is tangible and liquid and thus has the additional character of being able to produce a return on its own.[49]

The Federal Circuit addressed this phenomenon of the difference between supervisory goodwill and tangible capital in the specific context of a *Winstar* cost-of-cover claim: "[T]he benefits of ... capital must be credited, as mitigation due to the replacement of goodwill with cash." *LaSalle Talman*, 317 F.3d at 1375. Some adjustment, therefore, must be made to reflect the fact that plaintiffs were substituting with a more useful commodity.

Plaintiffs' damage model attempts to adjust for this difference in character between supervisory goodwill and tangible capital through Dr. Myers' "safe asset" offset. The real question posed by Dr. Myers' use of the safe rate offset is whether it accomplishes what the law contemplates, namely, some accounting for the difference between what was lost and what was substituted. We believe it does.

We begin by noting that Dr. Leftwich's critique is based on a misunderstanding of what Dr. Myers did. Dr. Myers does not assume that Home Savings actually invested the proceeds of the capital raising in a safe asset. The safe asset rate utilized by Dr. Myers addressed the *cost*, not the proceeds, of capital raisings. It represents the rate which Home Savings would have paid for an asset most closely comparable to supervisory goodwill. Dr. Myers is in effect arguing that the government should only have to reimburse plaintiffs for the premium they paid beyond the most comparable asset-namely, the intermediate term Treasury bond.

Defendant's approach admittedly appears somewhat more orthodox. It contends that plaintiffs have to calculate an offset in the form of benefits obtained beyond what was minimally necessary to make the substitution. In fact, however, this is not what Dr. Leftwich purports to do. His argument is not based on a calculation of how plaintiffs actually used the "tangible" character of the new capital. Instead, Dr. Leftwich contends that whatever cash plaintiffs generated through capital raisings should be assumed to produce a return equivalent to the highest rate of return plaintiffs would receive by paying off Home Savings' most expensive debt. It is the business of banks, he explained, to make money on money. Dr. Leftwich argues that Home Savings could have made an offsetting profit equivalent to what it was paying investors and that it would have made no economic sense to raise capital if it could not.

We note first that if Dr. Leftwich were correct, Mr. Deihl and Mr. Rinehart, those who managed Home Savings, would theoreti-

---

49. The fact that Home Savings did not raise tangible capital in order to generate cash does not vitiate the fact that it did, in fact, provide Home Savings with cash.

cally be ambivalent regarding the costs of raising capital in the marketplace, because the bank could automatically recoup those costs through investments. In reality, however, Mr. Deihl and Mr. Rinehart both testified that the additional cost associated with raising capital, unlike cash raised through deposits, was reason enough to refrain from raising capital unless it was necessary for regulatory compliance. We are not inclined to disbelieve them, and, as we have noted earlier, the Federal Circuit rejected this approach in *LaSalle Talman*.

The defense moreover, is fundamentally unfair. Whatever return plaintiffs expected to make from the bank would come from the process of intermediation of borrowed cash, in other words, cash from low interest bearing deposits. Replacement capital was only needed to make that operation legally permissible. It was not necessary for the purpose of raising cash. Plaintiffs would be deprived of the benefit of their bargain, in other words, if they had to offer back all the consequential profits they hoped to make by leveraging deposits proportionate to the new capital. This would be equivalent to contending, for example, that an injured party who replaces an undelivered vehicle at a higher price is entitled to no recovery because the vehicle will ultimately pay for itself through anticipated earnings.

There are other problems with this defense. The first is that it is unquantified and probably unquantifiable. As plaintiffs' witnesses explained, cash generated through capital raising is the same as any other cash flowing into the bank. It would be virtually impossible to track. Mr. Deihl and Mr. Rinehart both testified that cash, once raised by Home Savings, was fungible. There is no way to determine whether Home Savings invested the particular tangible capital raised to replace supervisory goodwill in a venture which made or lost money, or if the cash was used to pay routine expenses. There is thus no reason to assume that a dollar of capital pays off the highest outstanding borrowings, as opposed, for example, to paying the electricity bill. Determining a credit on that basis becomes hopelessly speculative.

The ultimate question is whether Dr. Myer's model-crediting the safe rate-really accomplishes what the law requires. Plaintiffs are plainly not entitled to be compensated for ending up in a better position than they would have been if defendant had not breached. *Citizens Fin. Serv. v. United States,* 57 Fed.Cl. 64, 71 n. 5 (2003) (citing DAN B. DOBBS, DOBBS ON REMEDIES § 12.3(2) (2d ed.1993)). We are satisfied that is not what is being claimed. Reducing the cost of replacement by the safe rate in effect credits the government with the benefits of tangible capital to the extent that it is most like supervisory goodwill. Plaintiffs are only entitled to be compensated for what they paid unnecessarily, namely, a premium for the cost of market capital in excess of the safe rate. We reject defendant's argument, and find that plaintiffs' model is an appropriate model for calculating damages.

4. Retained Earnings

We next address Dr. Leftwich's critique of Dr. Myers' use of retained earnings as a means of assessing damages beyond the point at which supervisory goodwill was replaced by market capital. He asserts that there are four flaws in Dr. Myers' cost of retained earnings. First, he asserts that if Home Savings were to retain earnings, the rates it would be required to pay uninsured depositors, and for unsecured liabilities, would be lower, because Home Savings debt to equity ratio improved by its increased equity from retained earnings. Dr. Leftwich explained that unsecured depositors would perceive less risk that Home Savings would not meet its obligations. He did not quantify this asserted effect and provided the court with no means of estimating it. We do not, for example, have any evidence that Home Savings will attempt to raise debt during the time period in which it plans to retain earnings. The mere possibility of this impact is insufficient grounds to modify the damages claim.

Dr. Leftwich's observations are also off the mark to the extent that he assumes Home Savings actually invested retained earnings in safe assets. As with the offset for market capital, it is theoretical and it would be virtu-

ally impossible to track the particular use of retained earnings.

Second, Dr. Leftwich asserts that utilizing retained earnings to purchase safe assets is not harmful to Home Savings. Due to the double taxation of dividends, the shareholder is not harmed by a corporation's retention of earnings. As an extension, he claimed that, so long as Home Savings purchases a safe asset at the market value price, there is no harm to stockholders. Because the corporation has not lost money in a fair market transaction, the shareholder is not harmed. In effect, this argument is once again a replay of Dr. Leftwich's NPV zero theory which we have already rejected.

In addition, and more substantively, the fact that existing shareholders may be satisfied with the net consequences of retaining earnings does not mean that there is no cost to Home Savings or its parent corporation. As Dr. Myers explained, the reason that Home Savings incurred costs from retaining earnings, is that

> people who supply equity capital demand a return. It isn't free. The easiest way to think about it is if a company goes out and issues stock .... [I]t [finds people to purchase the stock] by offering the people who buy the stock a slice of the company's assets, and a slice of its earnings, and a slice of its growth opportunity. So you give up something when you raise outside stock issues. Of course, retained earnings are not a stock issue, but they're basically the same thing, because you're asking your existing stockholders to put their money back into the business, and they're going to demand the same rate of return that people who buy [a new] stock issue would.

Trial Tr. at 246. Thus, regardless of whether Home Savings retains earnings, or issues new stock to gain capital, it must provide shareholders with a return. It is this return which is the basis of Home Savings' damages model.

Third, Dr. Leftwich argues that the evidence does not support a finding that Home Savings actually retained or will retain earnings to replace supervisory goodwill. Dr. Leftwich points to the core capital ratio of Washington Mutual, Home Savings' present

parent company, for 1998 to 1999. He argues that Washington Mutual would have needed an additional $337 million in core capital in 1999 to maintain the 1998 levels. Dr. Leftwich argues that Washington Mutual actually reduced its capital cushion, repurchased common stock and acted in a manner which indicated that it actually was not retaining earnings. For instance, in 1998, Washington Mutual's core capital ratio was 5.76% of assets, whereas it was only 5.53% of assets in 1999. Were Washington Mutual truly retaining earnings, he argues, its capital cushion would have remained stagnant.

We note at the outset that Dr. Myers did not contend that plaintiffs retained earnings for the years 1998 or 1999, as can be seen from his exhibit showing retained earnings. Moreover, Dr. Leftwich did not examine what Washington Mutual's capital cushion would have been absent FIRREA. Neither did Dr. Leftwich investigate the reasons for what he claims was a reduction in Washington Mutual's capital cushion. He simply documented that the capital cushion shrank. He acknowledged that Washington Mutual could both retain earnings and shrink its capital cushion. We are left, then, with the unpersuasive argument that, because Washington Mutual's capital cushion fell, it could not have retained earnings.

As we discussed *supra*, there is no necessary connection between the rise and fall of the absolute amount of the capital cushion and FIRREA. Instead, as Mr. Sanchez explained, thrifts have an overall planning structure for capital. This planning structure includes a target capital level, which thrifts attempt to meet, regardless of the changes in regulations such as FIRREA. Even if we were to accept Dr. Leftwich's argument that Washington Mutual's capital cushion did fall, we thus cannot draw the inference that the fall was due to its decision not to retain capital.

Dr. Leftwich's final argument is that once future damages are discounted back to the present, their present cost is zero. It is difficult to understand the real argument behind something so obviously counter-intuitive. If, in fact, there is a net cost to the

company in retaining earnings, as measured by the difference between what the shareholders would want as a minimum return and the safe rate, then bearing that cost into the future must be translatable into a present, discounted value, which, by definition, cannot be zero. The process should, in principle, be reversible, so that one could begin with the present value and translate it into an equivalent stream of future income. Even the miracle of compound interest would not convert zero, Dr. Leftwich's favorite number, into a future stream of income.

## D. Have Plaintiffs Met Their Burden of Proof?

■ Expectancy damages of the type claimed by plaintiffs are recoverable when they are "actually foreseen or reasonably foreseeable, are caused by the breach of the [government], and are proved with reasonable certainty." *Bluebonnet Sav. Bank v. United States,* 266 F.3d 1348, 1355 (Fed.Cir. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 347, 351, 352 (1981)); *see also Locke v. United States,* 151 Ct.Cl. 262, 270, 283 F.2d 521 (1960). We address each requirement in turn.

### 1. Foreseeability

■ Foreseeability is a question of fact, namely, whether the claimed damages are the "probable result of a breach because it follows from the breach ... in the ordinary course of events." RESTATEMENT (SECOND) CONTRACTS § 351; *see also Bluebonnet,* 266 F.3d at 1355. Plaintiffs bear the burden of proof. *See N. Helex Co. v. United States,* 207 Ct.Cl. 862, 876, 524 F.2d 707 (1975). Here, the question is whether regulators, at the time the Assistance Agreements were executed, could foresee that plaintiffs would be forced to replace supervisory goodwill, at a cost in the range now claimed, if it no longer counted towards regulatory capital. For the reasons set out below we find that the need for such replacement was foreseeable.

At the time of the supervisory merger, Home Savings was unwilling to put its financial health in peril in order to participate in a supervisory merger. Mr. Deihl explained that absent supervisory goodwill, Home Savings would have been forced to raise a prohibitive amount of capital prior to taking over a failing thrift. Both Mr. Deihl and Mr. Rinehart testified that had the supervisory goodwill not been provided, Home Savings would not have entered into a supervisory merger.

We heard from Mr. Beesley that the savings and loan crisis of the 1980s forced regulators to find ways to aid troubled thrifts while avoiding liquidation where possible and that regulators enticed healthy thrifts like Home Savings to enter into mergers supervised by regulators by actively touting the availability of supervisory goodwill. Mr. Beesley acknowledged that, had supervisory goodwill not been offered, acquiring thrifts would have needed additional capital before taking over an ailing thrift.

There is no direct evidence that the possibility of replacing supervisory goodwill with tangible capital, in the event of breach, was discussed at the time of the acquisition. The regulators understood, however, that absent supervisory goodwill, a healthy thrift would have been forced to raise the additional capital necessary to take-over an ailing thrift. The unavoidable inference, therefore, is that the regulators also understood that the elimination of supervisory goodwill would leave thrifts without the necessary regulatory capital to support the troubled thrift. Mr. Beesley acknowledged that it was not unreasonable for a thrift to react to the loss of supervisory goodwill by raising additional capital.

Indeed, there was no mystery about how the thrift would use supervisory goodwill. As the regulators had every reason to know, well-run thrifts such as Home Savings were very conscious of their capital ratios. The sudden conversion of negative worth from an asset (supervisory goodwill) to a liability, would, of necessity, force banks to re-evaluate their capitalization. For those striving to maintain their deposit and loan portfolios at roughly the same capital ratios the only choice would have been to take on replacement capital. In fact, Mr. Sanchez later met with Home Savings to aid it in determining how to meet capital requirements in light of

FIRREA, something entirely foreseeable in the event of breach.

Defendant also argues that the magnitude of damages which plaintiffs now claim were not foreseeable at the time of the contract, arguing "[t]he mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." *Landmark Land Co. v. United States*, 256 F.3d 1365, 1379 (Fed.Cir.2001) (citing 5 ARTHUR CORBIN, CORBIN ON CONTRACTS, § 1012 at 88 (1964)). Defendant's argument rests on the fact that Home Savings routinely carried capital in excess of regulatory minimums. Home Savings was a conservatively run thrift. It maintained a capital cushion well above the regulatory minimums. According to defendant this would entitle regulators to assume that Home Savings, rather than raise additional capital, would shrink its capital cushion.

The government's argument proves too much. Regulators were aware of Home Savings' capital ratios and that it was conservatively run. It consistently maintained a capital cushion well above regulatory minimums. There was no reason for regulators to assume that Home Savings would not have maintained its conservative practices. Rather, they had reason to make the opposite assumption, namely, that Home Savings would have replaced supervisory goodwill to maintain its typical capital cushion. We find, therefore, that it was foreseeable to regulators at the time of contracting that breach would cause plaintiffs to incur damages of the nature and magnitude they now claim.

### 2. Causation

Plaintiffs must also show that the government's breach produced damage "inevitably and naturally, not possibly or probably." *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353 (1951) (citing *Myerle v. United States*, 33 Ct.Cl. 1, 1800 WL 2024 (1897)). Plaintiffs have met this burden.

We have previously found that Home Savings maintained target capital levels independent of the effect of the breach. Mr. Deihl and Mr. Rinehart both testified that Home Savings established its capital cushion based on business considerations. We also have determined that Home Savings raised more capital than it otherwise would have because supervisory goodwill was eliminated from capital considerations. The evidence is clear that, had FIRREA not disallowed the use of supervisory goodwill, Home Savings would have raised less capital, in the amount of that disallowed supervisory goodwill. The cost of raising that capital is thus a direct result of the government's breach, *Ramsey*, 121 Ct.Cl. at 426, 101 F.Supp. 353.

There is nothing remote or consequential about these damages. Plaintiffs have isolated costs related only to the capital raised to replace supervisory goodwill. That Home Savings had other reasons to raise capital is immaterial. There were, thus, no "other substantial causes" apart from defendant's breach, for plaintiffs' damages. *See Am. Sci. & Eng'g, Inc. v. United States*, 8 Cl.Ct. 129, 139 (1985) (citing *DeLong Corp. v. Lucas*, 278 F.2d 804, 810 (2d Cir.1960)). Plaintiffs have met their burden to show that the removal of supervisory goodwill caused them to raise tangible capital in an equal amount.

### 3. Certainty

Plaintiffs must also prove damages with reasonable certainty. *Bluebonnet*, 266 F.3d at 1355. Plaintiffs' damages model, therefore, may not be based on mere speculation or hypotheticals. *Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. 108 (2003); *Willems Indust., Inc. v. United States*, 155 Ct. Cl. 360, 295 F.2d 822 (1961).

Our previous review of Dr. Myers' presentation and Dr. Leftwich's criticism of it satisfies us that plaintiffs have met their burden to prove damages with reasonable certainty. Plaintiffs' model is based on a solid foundation of actual business practices and actual costs. The only steps in plaintiffs' model which are not based on actual experience are the offset for the safe rate and the cost of future retained earnings. Costs of replacement capital into the future are, of necessity, a projection. Plaintiffs' projection, however, is based on real data. Plaintiffs have proven that they will replace all disallowed supervi-

sory goodwill, and that the use of retained earnings is a reasonable means to project damages.

Dr. Myers' estimate of the return that shareholders will require from plaintiffs is conservative. He began with the lowest cost source of capital which Home Savings has been able to raise, the subordinated debt issued in August 1994. Utilizing a cost which plaintiffs had actually incurred was a reasonable proxy for the return shareholders would require. It is unreasonable to expect an investor to accept a rate lower than the lowest available market rate. As the *LaSalle* court explained, a shareholder expects payment in future dividends.[50] A shareholder would not leave its capital in Home Savings if it was earning a return lower than the market rate.

Plaintiffs' use of the safe rate is precipitated by a fact over which they have no control-supervisory goodwill cannot be directly replaced. The cost of replacement model, of necessity, has to account for the unique character of that asset. Plaintiffs are not required to prove damages with absolute precision, however. Where plaintiffs prove that they are entitled to damages, "[i]t is enough if the evidence adduced is sufficient to enable a court ... to make a fair and reasonable approximation." *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 257, 416 F.2d 1345 (1969) (quoting *Specialty Assembling & Packing Co. v. United States*, 174 Ct.Cl. 153, 184, 355 F.2d 554 (1966)). The fact that there is an approximation included in plaintiffs' damages model does not frustrate their claim. *Id.*

Defendant nevertheless argues that plaintiffs' model is too speculative, citing *Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. 108, 136 (2003). In *Franklin Federal*, plaintiffs' models for both partial and full replacement of supervisory goodwill were based on the cost of a hypothetical issuance of preferred stock. Here, the claim is based on Ahmanson's actual costs in raising capital.

Furthermore, the court in *Franklin Federal* found that a damages claim which requested replacement damages in excess of two and a half times the amount of supervisory goodwill disallowed was inherently implausible. Here, it cost plaintiffs $81 million to replace $402.8 million in supervisory goodwill over the balance of a 40 year amortization period.

Furthermore, defendant asserts that the cost of plaintiffs' model does not reflect their actual experience with the proceeds of its preferred stock and subordinated debt offerings. As we discussed above, plaintiffs meticulously demonstrated their cost to raise or retain replacement capital. Of necessity, the offset for the safe rate must be hypothetical, nor are plaintiffs under an obligation to account for their use of the replacement capital, once raised. Plaintiffs' model provides a means by which the court can determine, with reasonable certainty, the amount by which they were damaged.

### III. Other Government Defenses

Plaintiffs have met their burden of proof that they were damaged by the FIRREA's disallowance of supervisory goodwill. What remains, then, is to determine whether the government raises any other defenses which defeat plaintiffs' damages claim. Defendant brings two defenses which we must address. First, defendant argues that plaintiffs did not appropriately mitigate for their loss when they raised replacement capital. Instead, plaintiffs could have chosen a different, and less costly, method for replacement. Second, defendant argues that plaintiff did not adequately account for the benefits of risk reduction gained with additional capital. We address them in turn.

### A. Mitigation

Defendant asserts, as an affirmative defense, that a "a non-breaching party generally may not recover damages attributable to that party's failure to take reasonable, nonburdensome steps to avoid its loss." *Koby v.*

---

**50.** As explained in *LaSalle Talman,*

the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings.... An investor does not make a gift when the expected payment is dividends out of future earnings. All capital raised by a corporation has a cost.

*LaSalle Talman,* 317 F.3d at 1375 (citations omitted).

*United States*, 53 Fed.Cl. 493, 496–97 (2002). Defendant argues that plaintiffs are not entitled to damages because they did not raise tangible capital by the least costly means. Dr. Leftwich testified that Home Savings could have avoided all of the claimed damages by issuing short-term floating-rate debt, and substituting this for Home Savings' other more expensive long term liabilities. Defendant further argues that plaintiffs could have raised capital from existing shareholders, suggesting this might have been a less costly alternative. As to the latter point, although Dr. Leftwich suggested that cheaper rates may have been available to Home Savings, he provides no actual evidence of what return shareholders would have demanded, and whether they were cheaper. We therefore have no means by which to evaluate Dr. Leftwich's contentions in that respect.

In any event, plaintiffs are not required to take all actions possible to avoid damages. *First Nationwide Bank v. United States*, 56 Fed.Cl. 438, 444 (2003). The question is whether the mitigation was reasonable. *Koby*, 53 Fed.Cl. at 497. Reasonableness, in turn, "is to be determined from all the facts and circumstances of each case... the person whose wrong forced the choice can not complain that one rather than the other was chosen." *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir.1950). Plaintiffs' mitigation efforts were part of its larger capital raising efforts. Replacing supervisory goodwill was not a separate undertaking. It was secondary to the larger need to maintain the desired capital ratios. Having heard at length the testimony of Home Savings' management, it is inconceivable to the court that these individuals would do anything other than what made the most business sense at the time, *i.e.*, at the lowest available cost. It is simply not credible that the management would have foolishly generated greater costs than necessary either out of negligence or on the assumption that they would simply be passed on to defendant.

Defendant's argument that Home Savings could have avoided costs by simply shrinking in size and carrying fewer assets is remarkable. It is tantamount to saying that plaintiffs had no right to expect the government to honor its commitments. Plaintiffs had the right to maintain their planned business activities, despite the government's breach.

**B. Risk–Reduction Benefit of Replacement Capital**

Defendant construes the Federal Circuit's decision in *LaSalle Talman*, 317 F.3d at 1375, to require plaintiffs to adjust their damages model for any risk-reduction benefits received from tangible capital. The risk-reduction benefit, as explained by the government, is the reduction in the amount of risk that an investor thought it was taking on by investing in Home Savings due to an influx of capital. Pointing to *LaSalle Talman's* requirement that the "benefits of capital must be credited," defendant asserts that plaintiffs have not adequately adjusted for the risk-reduction benefit.[51]

We find no specific requirement in *LaSalle Talman* that a risk-reduction benefit must be credited to the government. Instead, plaintiffs' use of the safe rate of return to adjust for the benefits of tangible capital meets *LaSalle Talman's* requirements. Neither defendant's expert nor any of defendant's other witnesses attempted to quantify the risk-reduction benefit. Additionally, Mr. Deihl explained that the rate that Home Savings paid for capital depended a "great deal on what the conditions of the markets were." He was, therefore, uncertain that additional capital would actually lower the rates Home Savings paid on other debt. We decline to reduce plaintiffs' damages on this basis.

In sum, we conclude that plaintiffs have proven their damages in terms of foreseeability, causation, and certainty.

**IV. Tax Gross–Up**

Plaintiffs request tax gross-up for their award. Alternatively, they offer a separate damage calculation which assumes

---

**51.** Defendant's post-trial brief, in part, relies upon a statement made by an expert apparently engaged by plaintiffs at one time, Dr. Donald

Kaplan. Because Dr. Kaplan did not testify at trial, we place no weight on those statements.

costs from a pre-tax standpoint (which produces slightly larger damages.) Gross-up of an award is appropriate where it is necessary to place plaintiffs in the position they would have been in absent the breach. *See Shaw v. Sec. of Dep't of Health & Human Serv.*, 18 Cl.Ct. 646, 654 (1989) (increasing award in vaccination case where "the award should be adjusted to offset taxes which will be paid on income"). Dr. Myers' model is based on after-tax calculations, determining that Home Savings was harmed in the amount of $80,936,000. Plaintiffs assert that they will be required to pay taxes on this award, and are entitled as a matter of law to a gross up at the rate of 38.37% to a total award of $134,045,000.

Where plaintiffs would not have paid taxes on the amount recovered, absent defendant's breach, that is, where the recovery is taxable but those monies to which plaintiffs were entitled would not have been further taxable, gross-up is appropriate. *See Oddi v. Ayco Corp.*, 947 F.2d 257, 267 (7th Cir.1991). For example, we found that gross-up was appropriate in *First Nationwide v. United States*, 56 Fed.Cl. 438 (2003). In that *Winstar*-related case, plaintiffs brought a claim for tax benefits they had been denied by changes in legislation regulating thrifts, in contravention of their contract with the government. Under the contract, Plaintiffs would have received assistance from the FDIC which was not taxable. The court found that the award to plaintiffs would be taxed, and should therefore be grossed-up to give plaintiffs full restitution. *Id.* at 449.

Plaintiffs, however, must prove that the damages, once awarded, will be taxed. *See Centex v. United States*, 55 Fed.Cl. 381 (2003) (finding that because the damages awarded to plaintiffs were for money not subject to taxation, the award was not grossed up because it had already been taxed). Plaintiffs assert that these damages will be subject to taxation, as they are rightly attributable to the gross income of Washington Mutual, plaintiffs' parent corporation. I.R.C. §§ 61(a), 11(b)(1)(D), 1201(a) (2003). There is nothing to suggest that plaintiffs are not correct. By using post-tax dollars in the calculation, in other words, but not grossing up the award, the result would be that plaintiffs would not be put into the same position as if the breach had never occurred. They would have used post-tax dollars in incurring costs, but then been subject to taxation of the award.

Plaintiffs must also prove with reasonable certainty the rate at which they will be taxed. *LaSalle Talman*, 45 Fed.Cl. at 110. There was extensive evidence in this regard. Mr. Robert Miles testified for plaintiffs regarding the marginal tax rate of Home Savings from 1990 to 1997, as well as after its acquisition by Washington Mutual in 1999. Mr. Miles is a CPA and a tax accountant. He began his career at Peat Marwick Mitchell, now KPMG, his practice focusing primarily on the savings and loan industry. From 1996 to 1999 he was employed at South Boston Savings Bank, as the tax director. In 1999, Mr. Miles became the senior vice president director of tax for Washington Mutual. In 2001 Mr. Miles became the Comptroller of Washington Mutual. In his position, Mr. Miles oversees the preparation of tax returns, as well as tax planning strategies for Washington Mutual. The court found him to be a competent and credible witness.

Mr. Miles projected Washington Mutual's tax liability on any damages awarded in this case to be 38.37%. He acknowledged that it is impossible to know with absolute certainty what the tax rate for any award in this matter will be. Mr. Miles explained, however, that his is a very close estimate. It was based not only on the marginal tax rate paid by Washington Mutual in previous years, but also on the estimates already made for 2003 tax purposes. Mr. Miles explained how Washington Mutual did its forecasting, explaining their basis and historic accuracy. Mr. Miles further testified that it is a near impossibility for Washington Mutual's marginal tax rate to fall below 35%, the highest federal tax rate based on Washington Mutual's yearly income. However, he also testified that it was highly unlikely that the marginal tax rate for an award from this case would be in excess of 39%. Based on this analysis and an assumed figure for damages of $80,936,000, he calculated a tax adjusted amount of $134,045,000.

Defendant counters that the tax gross-up requested by plaintiffs is too speculative. It claims that Washington Mutual's tax rate cannot be known with absolute certainty and that plaintiffs could defer some tax liability in the future, thereby impacting rates. Defendant argues that *Medcom Holding Co. v. Baxter Travenol Labs.*, 106 F.3d 1388, 1404 (7th Cir.1997), councils against grossing-up awards such as this one. In *Medcom*, the Seventh Circuit upheld the district court's finding that grossing-up the award there would be speculative, in light of assumptions as to what plaintiff would have done had the contract been completed. We are satisfied that plaintiffs here have demonstrated with as much certainty as is possible under the circumstances both that they will pay tax on the recovery and what the rate will be.

### CONCLUSION

We find that plaintiffs have proven damages in the amount of $134,045,000. The clerk is directed to enter judgment in that amount. Costs to plaintiffs.